[No. 6297–1. Division One. April 16, 1979.]

ROBERT S. KIMMEL, *Appellant,* v. CROWLEY MARITIME CORPORATION, ET AL, *Respondents.*

*McCutcheon, Groshong, Geisness & Day* and *James D. McCutcheon, Jr.,* for appellant.

80

*Detels, Draper & Marinkovich* and *Donald P. Marinkovich,* for respondents.

JAMES, J.—This case involves the application of Washington's "Law Against Discrimination," RCW 49.60, to physically handicapped persons.

Plaintiff Robert S. Kimmel had worked as an able–bodied seaman on tugboats operating out of Seattle. In October 1970, while working on a tug owned by Alaska–British Columbia Transportation Company (Alaska–B.C.), a wholly owned subsidiary of defendant Crowley Maritime Corporation (Crowley), Kimmel sustained an injury to his right knee. Following a medial meniscectomy (surgical removal of the medial cartilage) on his right knee in February 1971, Kimmel returned to work. His injury eventually required a similar operation on his left knee in January 1974. Kimmel brought a damage action against Alaska–B.C., alleging permanent partial disability. In October 1974, Kimmel started work for Pacific Inland Navigation Company (PAC).

In October 1975, Crowley acquired most of PAC's tugboats. Although Crowley purported to try to utilize all PAC personnel, Kimmel was not employed. Defendant Richard Osborne, the Crowley vice president for labor relations who was responsible for the decision not to employ Kimmel, cited Kimmel's history of knee problems as the basis for his decision.

Kimmel filed suit against Crowley and Osborne, charging that his knee injuries qualified him as a "handicapped person" protected by the "Law Against Discrimination" and that Crowley had wrongfully discriminated against him by refusing to employ him even though the condition of his knees did not impede his work performance.

Following a nonjury trial, the trial judge entered judgment for the defendants, who will hereinafter be collectively referred to as Crowley. The trial judge concluded that Kimmel was not "a handicapped person as defined by the provisions of RCW 49.60, et seq., and may not recover against defendants on that basis." Conclusion of law No. 4. Alternatively, the trial judge concluded that Crowley's refusal to hire Kimmel was sanctioned by RCW 49.60.180(1).[1] Kimmel's 20 assignments of error on appeal present two issues: (1) Did the trial judge err in concluding that Kimmel was not a "handicapped person" within the purview of RCW 49.60? (2) Did the trial judge err in concluding that Kimmel was not "[a]n 'able handicapped worker' . . . whose handicap does not prevent the proper performance of the particular job in question"? WAC 162–22–020. We agree with Kimmel's contention that the trial judge erred in resolving both issues and reverse.

The "Law Against Discrimination" declares that the right to employment without discrimination is a civil right and a "matter of state concern" because "such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state." RCW 49.60.010. RCW 49.60-.030; RCW 49.60.180. Violation of the law is compensable by an award of damages or injunctive relief or both. RCW 49.60.030. In 1973, the legislature amended the law to include "physical handicap" as a human condition deserving of the law's protection.

---

[1]RCW 49.60.180 provides in part:
"It is an unfair practice for any employer:
"(1) To refuse to hire any person because of such person's age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical handicap, unless based upon a bona fide occupational qualification: *Provided*, That the prohibition against discrimination because of such handicap shall not apply if the particular disability prevents the proper performance of the particular worker involved."

█ Our Supreme Court has recently discussed the burden employers must bear when denying employment because of alleged physical handicap.

RCW 49.60 contains a strong statement of legislative policy. *See,* RCW 49.60.010 and .030. When, in 1973, the legislature chose to make this policy applicable to discrimination against the handicapped, we believe it is clear it mandated positive steps to be taken. An interpretation to the contrary would not work to eliminate discrimination. It would instead maintain the *status quo* wherein work environments and job functions are constructed in such a way that handicaps are often intensified because some employees are not physically identical to the "ideal employee".

*Holland v. Boeing Co.,* 90 Wn.2d 384, 388–89, 583 P.2d 621 (1978).

With respect to employment, the legislature's clearly expressed intent was to ensure that, to the maximum practicable extent, handicapped but qualified persons would have the right to employment. RCW 49.60.010; RCW 49.60.030; RCW 49.60.180. To that end, liberal construction is expressly called for. RCW 49.60.020; *Holland v. Boeing Co., supra. See Chicago, M., St. P. & Pac. R.R. v. Department of Indus., Labor & Human Relations,* 62 Wis. 2d 392, 215 N.W.2d 443 (1974).

We first consider whether the trial judge erred in concluding that Kimmel was not "handicapped" for purposes of the law. If his conclusion is correct, the law does not apply and we need not consider Kimmel's remaining assignments of error.

██ As noted by the trial judge, whether a person is "handicapped" is a question of law. *Chicago, M., St. P. & Pac. R.R. v. Department of Indus., Labor & Human Relations, supra.* The law itself contains no definition of "handicap." Regulations promulgated by the Washington State Human Rights Commission pursuant to RCW 49.60-.120(3) provide that "for enforcement purposes a person will be considered to be *handicapped* by a sensory, mental, or physical condition if he or she is *discriminated against*

*because of the condition* and the condition is abnormal." (Italics in original.) WAC 162–22–040(1)(a). Such regulations by the agency empowered to administer the statute are entitled to be given great weight. *Holland v. Boeing Co., supra.*

It was not disputed that the condition of Kimmel's knees was "abnormal," and that he was not retained by Crowley because of that condition. We hold that the trial judge erred in concluding that Kimmel was not "handicapped" and not entitled to the law's protection.

We must then consider whether the trial judge erred in concluding that Crowley's refusal to hire Kimmel was sanctioned by the law.

RCW 49.60.180(1) provides two bases upon which an employer may justifiably "refuse to hire" a physically handicapped person. One is that the person's physical handicap is such that he cannot fulfill a bona fide occupational qualification (BFOQ). The other is that the person's "particular disability prevents the proper performance of the particular worker involved." RCW 49.60.180(1).

As stated in WAC 162–16–020(2), "[t]he term 'bona fide occupational qualification' has not been defined by the legislature." In concluding that Crowley's refusal to hire Kimmel was sanctioned by RCW 49.60.180(1), the trial judge did not clearly distinguish between the two provisions of the statute. We read his formal conclusions of law to be that although Kimmel's "particular disability" (RCW 49.60.180(1)) did not impair his "present ability to do the job" (conclusion of law No. 7), he nevertheless did not meet a reasonable BFOQ. Though not expressly articulated, the trial judge concluded that a reasonable BFOQ for a tugboat deckhand is a bodily condition that does not present a "safety hazard to the applicant and to his co–workers [because of] any physical deterioration the body of the applicant may experience in the future as a result of [the] job, as compared to a person without the alleged handicap." Conclusion of law No. 7.

Thus interpreted, the trial judge's ultimate conclusion that Kimmel "would have presented an unreasonable hazard to himself and others while working as a seaman on tugboats and thereby [would have] unreasonably increased the risk of liability to defendant Crowley" (conclusion of law No. 7) is based upon his ultimate finding of fact that "there is a reasonable probability that a man who has sustained the injuries, and received the surgery, as has [Kimmel], would be more susceptible to injury in the employment in which [Kimmel] sought to be engaged." Finding of fact No. 17.

We find that the trial judge's dispositive finding of fact was not supported by substantial evidence.

The decision to refuse Kimmel employment was made solely by Osborne. He testified that his decision was justified by Kimmel's apparent serious and permanent injuries. In a letter to Kimmel's union, Osborne stated:

> As you may or may not be aware, Mr. Kimmel brought suit against Puget Sound Tug & Barge Company [sic] in connection with certain injuries involving both knees and his right hand. In connection with that lawsuit Mr. Kimmel testified under oath that he has serious disabilities which hinder him in his work as a seaman. Mr. Kimmel testified specifically that he is not able to do the job he should aboard tugs.
>
> Mr. Kimmel has had surgery upon both knees and it is our understanding that at least one physician has recommended additional knee surgery. This, coupled with a permanent disability of the right hand, in our opinion, renders Mr. Kimmel a poor risk and a seaman who might well create a hazard to other men who are required to work with him.

Exhibit 4, in part.

Kimmel's suit against Alaska–B.C. was settled before trial. Before settlement was reached, two orthopedic surgeons, each of whom had examined Kimmel, reported their findings. One, dated May 13, 1974, concluded as follows:

> This patient has had the medial cartilage removed from both knees. The right knee was previously rated at 15% of the amputation value at the knee joint and from

the examination findings on this date, this rating is adequate. The left knee, based on the loss of the medial cartilage, I would estimate to be 10% loss of the normal function or 10% of the amputation value of the left knee. *This patient is able to continue with his work as a seaman.* His condition at this time appears to be fixed and no further treatment is necessary.

(Italics ours.) Exhibit 5, in part. The other, dated June 7, 1974, concluded as follows:

This patient has some permanent impairment to both knees. *He should be fit to try to work again* and several trials of work may be necessary before determination can be made as to whether or not he should change occupations. It is obvious that even with a lessor [*sic*] impairment of the knees the type of work which he does could be responsible for considerable disability.

(Italics ours.) Exhibit 6, in part.

Osborne testified that he relied upon these reports in deciding not to employ Kimmel. However, at trial, Crowley relied heavily on the testimony of an orthopedic surgeon who stated that, in his opinion, Kimmel would be "more subject to risk" because of his knee injuries and that "he should not be employed on tugboats." This doctor had not examined Kimmel but, shortly before trial, had reviewed a file that contained the medical records concerning Kimmel's industrial injuries.

Osborne testified that at the time he made his decision to deny Kimmel employment, he did not make any inquiry of PAC concerning Kimmel's "on–the–job" performance. He further testified that when Kimmel obtained a personal interview in pursuit of employment, he "asked him no questions [and] did not choose to discuss with [him] what his relationship with PAC [was and] how long he had worked there at all." He further testified that in a 20– to 30–minute interview, the question of "whether he had any physical problems while he was doing his work" was not discussed. He conceded that it would "take a pretty good man" to do the work that Kimmel had been doing for PAC.

Kimmel's January 1974 operation on his left knee had been performed at the United States Public Health Service Hospital and he had been given a "fit for duty" slip and had returned to work for PAC in October 1974. Kimmel testified that subsequent to his last surgery, he had performed his duties without difficulty. The chief mate of a PAC tug on which Kimmel had been employed during 1975 corroborated Kimmel's testimony.

■ We hold that a trial court's standard of review of an allegedly discriminatory denial of employment should be similar to appellate review of a trial court's fact findings: Was Osborne's decision that Kimmel was a "poor risk and a seaman who might well create a hazard to other men who are required to work with him" supported by substantial evidence? Exhibit 4, in part. Using this standard, we find that Crowley's refusal to employ Kimmel was discriminatory.

At the time Osborne's decision was made he knew, or in the exercise of reasonable care could have known, the following: (1) Kimmel had suffered an industrial injury which required surgery on both of his knees; (2) one qualified medical expert engaged by his employer to examine Kimmel was of the opinion that although Kimmel had some partial permanent disability, he was "able to continue with his work as a seaman" (exhibit 5, in part); (3) a second qualified expert was of the opinion that Kimmel had "some permanent impairment to both knees" but was "fit to try to work again" (exhibit 6, in part); (4) Kimmel did in fact "try to work again." He had found employment as a tugboat deckhand for PAC and for approximately a year performed his job without difficulty.

■ It was Kimmel's initial burden at trial to establish a prima facie case of physical handicap discrimination. *See* *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). Kimmel met his burden by presenting evidence of Osborne's stated reason for refusing employment. He introduced a letter from Osborne to his union, in which Osborne stated, "[W]e wish to reiterate our

position that we cannot hire Mr. Kimmel because of apparent serious and permanent injuries with which he is afflicted." Exhibit 4, in part.

The burden then shifted to Crowley "to articulate some legitimate, nondiscriminatory reason" for not hiring Kimmel. *McDonnell Douglas Corp. v. Green, supra* at 802. In *Panettieri v. C.V. Hill Refrigeration,* 159 N.J. Super. 472, 485, 388 A.2d 630, 636–37 (1978), the New Jersey appellate court concluded that

> once [the employee] established a prima facie case of unlawful discrimination on the basis of physical handicap (as he did), the burden of proof shifted to the employer to prove its defense that the nature and extent of the handicap was such as precluded performance of job duties or that the employer acted in accord with an opinion reasonably arrived at that such was the case.

■ Crowley did not meet its burden of producing substantial evidence to justify Osborne's decision. Osborne's stated reason for refusing to hire Kimmel was no more than a layman's opinion on a matter requiring expert medical judgment. No substantial evidence considered by Osborne warranted his decision. The trial judge erred in concluding that Kimmel was not an "'able handicapped worker' . . . whose handicap does not prevent the proper performance . . ." of the job he sought with Crowley. WAC 162–22–020.

The judgment dismissing Kimmel's complaint is reversed and the case remanded for further proceedings not inconsistent with this opinion.

ANDERSEN and DORE, JJ., concur.

Reconsideration denied June 21, 1979.

Review denied by Supreme Court September 21, 1979.