386 S.E.2d 1

Dorothy COFFMAN

v.

**WEST VIRGINIA BOARD OF REGENTS, A Corporation, Douglas A. Clark, et al.**

No. 17904.

Supreme Court of Appeals of West Virginia.

Decided June 2, 1988.

Dissenting Opinion Sept. 12, 1988.

Susan S. Brewer, William E. Galeota, Steptoe & Johnson, Clarksburg, for W.Va. Bd. of Regents et al.

Allen N. Karlin, Morgantown, for W.Va. Chapter of Nat. Lawyers Guild.

William F. Byrne, Morgantown, amicus curiae, for W.Va. Advocates for Developmentally Disabled and W.Va. Trial Lawyers Assoc.

Jacques R. Williams, Hanstead & Hanstead, Morgantown, for Dorothy Coffman.

**74**

BROTHERTON, Justice:

The West Virginia Board of Regents appeals an order of the Circuit Court of Monongalia County denying the Board's motion to set aside a jury verdict in favor of the appellee, Dorothy Coffman. In the action below, Coffman claimed that she was handicapped as a result of a back injury and that the appellants [1] had wrongfully terminated her employment at West Virginia University Hospital because of that handicap. For the reasons set forth below, we reverse the judgment of the Circuit Court of Monongalia County and remand with instructions to enter judgment in favor of the appellants.

Dorothy Coffman was employed as a Custodian I at the West Virginia University Hospital in Morgantown, West Virginia. In October, 1980, Coffman injured her back while emptying garbage cans. During the months following the injury, Coffman suffered back pain which interfered with her ability to perform the duties of her job. In June, 1981, Coffman submitted to her supervisors the unsolicited reports of two physicians who recommended that Coffman avoid activities which required heavy lifting. One of the physicians, an orthopedist, concluded that Coffman was temporarily disabled. Coffman then missed work the month of July, 1981, during which time she received temporary total disability benefits from workers' compensation.[2] Coffman's supervisors then directed her to Dr. Ed Morgan, Medical Director of University Health Service at West Virginia University, for a more detailed evaluation of her medical problem and for a recommendation of job limitations. Dr. Morgan concluded that Coffman was "okay for light work; can lift 10–15 lbs."

Consistent with these medical recommendations, when Coffman returned to work in August, 1981, she was relieved of garbage handling duties and was moved from loca-tion to location performing other cleaning tasks. The appellants assert that two significant problems developed. First, there were complaints from other employees that Coffman was not pulling her share of the load. Second, Coffman continued to complain of back pain. The record indicates that on October 21, 1981, Coffman was sent to the emergency room at the hospital after reporting that her back had started to hurt again. On November 30, 1981, one of the orthopedists who had examined Coffman previously recommended that Coffman no longer work in either the housekeeping or dietary departments and that she not be placed in a position that required prolonged sitting.

On December 2, 1981, personnel management representatives, including Thomas Serpento, met with Coffman to discuss her employment situation. At that meeting, Coffman told Mr. Serpento that her back hurt continuously and indicated bending limitations. Mr. Serpento testified that a Custodian I is expected to work in a bending position approximately fifty percent of the time. Based on the information provided by Coffman and the medical recommendations from the physicians who had examined her, Mr. Serpento recommended to Coffman's supervisors that she be separated from the housekeeping and dietary departments with the understanding that a search would begin to see if another position for Coffman was available within the University structure.

By memorandum dated December 18, 1981, Coffman was assigned to work with another custodian on the unit position, which consisted of cleaning the individual patient rooms at the hospital. Coffman's position was unique, however, in that she did only the "high" cleaning while a co-worker did the "low" cleaning. The memorandum did not indicate whether this position was temporary or permanent. By let-

---

1. Douglas A. Clark and Marc R. Connelly are also appellants. At the time of this action, Mr. Connelly was Coffman's immediate supervisor in the housekeeping department at the West Virginia University Hospital and Mr. Clark was an associate supervisor in the housekeeping department.

2. During this period, Coffman was examined by another orthopedist, who advised that she lift no more than ten pounds and avoid prolonged or repeated bending.

ter dated January 14, 1982, Coffman's supervisor notified her that if a position were not found for her elsewhere, she would have to be terminated from her job as a Custodian I as of January 25, 1982. The search for another position was unsuccessful, and Coffman's employment was terminated on January 25, 1982.

On January 24, 1984, Coffman filed a complaint in the Circuit Court of Monongalia County charging that the appellants had wrongfully discharged her because of her handicap, *i.e.,* back injury. In November, 1986, the case was tried before a jury which rendered a verdict in favor of Coffman in the amount of $55,600.00. The Board of Regents appeals, assigning as error the trial court's failure to direct a verdict in its favor. The appellants argue that the trial court erred in submitting the question of reasonable accommodation to the jury because Coffman was not a "qualified handicapped person" entitled to demand or expect reasonable accommodation.

The employment rights of the handicapped are governed by the West Virginia Human Rights Act, W.Va.Code § 5–11–1— § 5–11–19 (1987). The Act prohibits employment discrimination against an individual who is able and competent to perform the services required even with his handicap.[3] A "handicap" is "any physical or mental impairment which substantially lim-

its one or more of an individual's major life activities." W.Va.Code § 5–11–3(t) (Supp. 1987).

In 1982 the West Virginia Human Rights Commission promulgated regulations intended to interpret and implement the provisions of the West Virginia Human Rights Act relating to handicap discrimination. *See* Regulations, W.Va.HRC, W.Va.Code § 5–11, Series I, August 1, 1981.[4] In drafting the regulations, the West Virginia Human Rights Commission concluded that in determining whether an individual is entitled to protection under the West Virginia Human Rights Act, consideration must be given to whether "reasonable accommodation" by the employer would enable the individual to perform the services required. Specifically, Regulation 4.01 provides in part that "[n]o employer shall, on the basis of handicap, subject any qualified handicapped person to discrimination in employment...."[5] "As it relates to employment, a 'qualified handicapped person' is one who is able and competent, with reasonable accommodation, to perform the essential functions of the job in question." Regulation 4.02.[6] "Reasonable accommodations are adjustments or modifications to the work assignment or work environment to enable a handicapped person to fulfill employment responsibilities." Regulation 4.03(1).[7]

---

**3.** W.Va.Code § 5–11–9(a) (1987) provides that it shall be an unlawful discriminatory practice "[f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is ... handicapped...."

**4.** For convenience, throughout this opinion the regulations are cited as "Regulation." Although not raised by the parties to this case, we note that the regulations became effective on August 1, 1982, approximately six months after the appellants terminated Coffman's employment.

**5.** Regulation 2.01, following Code § 5–11–3(t), defines "handicap" as "any physical or mental impairment which substantially limits one or more of a person's major life activities." Regulation 2.02 defines "physical impairment" as "any physiological disorder or condition or cosmetic disfigurement or anatomical loss or abnormality affecting one or more of the following body systems: neurological, musculoskele-

tal, special sense organs, respiratory...." "Major Life Activities" include employment. *See* Regulation 2.05. Handicap discrimination law in West Virginia is derived largely from the federal Rehabilitation Act and the accompanying regulations. *See* The Rehabilitation Act of 1973, 29 U.S.C. § 701–796i (1982); 45 C.F.R. 84.3, 84.11, 84.12 (1987).

**6.** *See* 45 C.F.R. 84.3(k) (1987).

**7.** "Reasonable accommodations" include, but are not limited to:
(a) Making the worksite accessible to and usable by handicapped persons;
(b) Modification of equipment or tools so they can be used by a handicapped person;
(c) Job restructuring and modified work schedules;
(d) Alteration of the amount or methods of training;
(e) Acquisition of adaptive aids or devices;
(f) Reasonable accommodation should include the preparation of fellow workers for

## I.

We address first the appellants' argument that Coffman was not a "qualified handicapped person" entitled to protection under the West Virginia Human Rights Act because she could not perform the essential functions of her job *without* reasonable accommodation. The appellants assert that the right to "reasonable accommodation" does not arise unless and until the plaintiff demonstrates sufficiently to the court that she can perform the job without regard to accommodations. We disagree. The language of Regulation 4.02 is clear: a qualified handicapped person is "one who is able and competent, *with reasonable accommodation*, to perform the essential functions of the job in question." (emphasis added).[8] Accordingly, Coffman was a qualified handicapped person if she was able and competent to perform the essential functions of a Custodian I with reasonable accommodation.

## II.

As a threshold matter, the record shows that Coffman could not perform the essential functions of a Custodian I,[9] the job for which she was hired.[10] The ques-

the new employee, to obtain their understanding of the handicapping limitations and their cooperation in accepting other reasonable accommodations for the new employee. Regulation 4.03.

8. *Cf. School Bd. v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Discussing the inquiry to be made to determine whether, in the employment context, an individual is an "otherwise qualified person" as defined in 45 C.F.R. § 84.3(k) (1985), the *Arline* Court stated: "[W]hen a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions." 107 S.Ct. at 1131 n. 17. Similarly, in *Trimble v. Carlin,* 633 F.Supp. 367 (E.D.Pa. 1986), the defendant argued that "a person is not 'qualified' unless he can perform all of the duties of the position in question without any type of modification thereof." 633 F.Supp. at 370. The *Trimble* court rejected the defendant's argument, stating that "the Court is obliged to review the duties of a mail handler to determine whether Trimble can perform the essential functions of the position with 'reasonable accommodation' to his physical limitations. If so, he is a 'qualified handicapped person.'" *Id.*

9. The *Custodian I* job description lists the following principal duties:
   1. Sweep, mop, scrub, dust, wash, and polish floors, stairs, furniture, walls, windows, radiators, ventilators and other items.
   2. Clean and disinfect bathroom floors, fixtures, stalls, and other plumbing facilities.
   3. Clean and disinfect beds and other furniture or equipment in hospital rooms and wards.
   4. Remove trash; replace toilet supplies; replace accessible light bulbs; may lock and unlock rooms for tenants or authorized staff if action is approved by supervisor.
   5. Change linens, draperies, and make beds as needed.
   6. When assigned, perform simple mending repairs of linen and upholstery.
   7. May move, set-up and take down lightweight displays, chairs and equipment.
   8. Clear water, ice or snow from walks, steps and entrances using brooms, shovels or abrasives.
   9. Requisition parts and supplies and recommend material needs.
   10. Perform work in neat, orderly manner and within established building and safety codes.
   11. Maintain clean work area.
   12. Perform other related duties as assigned for emergencies or training purposes.

10. When Coffman returned to work after injuring her back, the appellants relieved her of garbage handling duties, moved her from location to location within the hospital, and instructed her to avoid lifting and prolonged bending. Despite these adjustments and modifications, however, Coffman still complained of back pain and subsequent medical evaluations resulted in recommendations that she be permanently separated from the housekeeping and dietary departments. While modifications such as long-handled tools may have enabled Coffman to perform duties which required bending, we cannot envision, and Coffman has not suggested, any type of reasonable modification which would have accommodated her lifting restrictions. Thus, the uncontradicted testimony and medical evidence established conclusively that Coffman could not perform the essential lifting and bending requirements of her job. We therefore find that as a matter of law Coffman, even with reasonable accommodation, was unable to perform the duties of the job for which she was hired and the appellants were not required to retain her in that position. "[W]here all of the evidence, fairly considered, points to one conclusion only, a question of law is presented which is to be answered by the court, not the jury." *Beneficial Finance Co. v. Collins,* 150 W.Va. 655, 149 S.E.2d 221, 227-28 (1966). In so holding, we do not attempt to

tion we address is whether "reasonable accommodation" required the appellants to retain Coffman doing only the "high" work in the unit position, the job created for Coffman when she could no longer perform the duties of a Custodian I. Recognizing the similar treatment of reasonable accommodation under the West Virginia Human Rights Act and the federal Rehabilitation Act, we review the decisions of the federal courts which have addressed the issue of alternative employment as reasonable accommodation for a handicapped employee who can no longer perform the job for which she was hired. For example, in *Alderson v. Postmaster General*, 598 F.Supp. 49 (W.D.Okl.1984), the United States District Court for the Western District of Oklahoma considered whether the Postal Service had violated the federal Rehabilitation Act by terminating a mail carrier after he suffered a knee injury on the job. The court recognized that under the relevant regulations, 29 C.F.R. § 1613.704(b), reasonable accommodation may include "job restructuring" but stated that nothing in the regulation required assignment to a different job. Rather, the court concluded that the "regulation clearly refer[red] to making the particular job, not another job for which the handicapped person was not hired, accessible to handicapped persons." 598 F.Supp. at 55.

Similarly, in *Carty v. Carlin*, 623 F.Supp. 1181 (D.Md.1985), the United States District Court for the District of Maryland considered whether the Postal Service violated the Rehabilitation Act by discharging a laborer/custodian employee because of a physical and mental handicap.

The district court rejected a recommendation that the employee "be reinstated to the position of distribution clerk or any other position which he was able to perform in light of his physical and mental handicap." *Id.* at 1183. Reasoning that "[p]referential reassignment for handicapped employees was not intended by the Rehabilitation Act," the court concluded that "[e]xamination of the regulation lends [sic] to the ultimate conclusion that the duty to reasonably accommodate only contemplates accommodation of a qualified employee's present position. It does not include a requirement to reassign or transfer an employee to another position." *Id.* at 1188. *See also Wimbley v. Bolger*, 642 F.Supp. 481 (W.D.Tenn.1986) (reasonable accommodation does not require federal agency to transfer handicapped employee from job for which he was employed to some other position to provide him work he can perform); *Bento v. I.T.O. Corp.*, 599 F.Supp. 731, 745 (D.R.I.1984) (Rehabilitation Act does not obligate companies to rewrite job descriptions).[11]

Most recently, in *Carter v. Tisch*, 822 F.2d 465 (4th Cir.1987), the United States Court of Appeals for the Fourth Circuit considered whether the Postal Service was required to accommodate a mail carrier, handicapped by asthma, by assigning him to a permanent light duty position. Citing *Alderson, Carty,* and *Wimbley,* the Fourth Circuit observed that "[t]he case law is clear that if a handicapped employee cannot do his job, he can be fired, and the employer is not required to assign him to alternative employment."[12] *Id.* at 467.

---

delineate the parameters of reasonable accommodation. Such a determination must be made on a case-by-case basis.

11. *Cf. School Bd. v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). In *Arline* the Court concluded that a school teacher suffering from tuberculosis was a "handicapped individual" within the meaning of the Rehabilitation Act. However, in dicta the Court commented on the issue of alternative employment as reasonable accommodation of an employee's handicap. The Court stated:

Employers have an affirmative obligation to make a reasonable accommodation for a handicapped employee. Although they are not required to find another job for an employee who is not qualified for the job he or she was doing, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies.

107 S.Ct. at 1131 n. 19 (citations omitted).

12. In *Carter* a collective bargaining agreement required five years service as a prerequisite for permanent light duty eligibility. 822 F.2d at 466. The mail carrier had not served five years. *Id.* Although the collective bargaining agreement did not form the basis of the court's decision, the Fourth Circuit noted that the Postal

The court concluded that the employee "was incapable of performing the full duties of a laborer-custodian, and the government had no obligation to provide him with a different job." *Id.* at 469.[13]

■ We find the reasoning of these courts persuasive and conclude that under the West Virginia Human Rights Act and the accompanying regulations, "reasonable accommodation" requires only that an employer make reasonable modifications or adjustments designed as attempts to enable a handicapped employee to remain in the position for which he was hired.[14] Where a handicapped employee can no longer perform the essential functions of that position, reasonable accommodation does not require the employer to reassign him to another position in order to provide him with work which he can perform. Turning to the facts of the present case, when Coffman was no longer able to perform the essential duties of a Custodian I, the appellants placed her in the unit position. While assigning Coffman to the unit position doing only the "high" work provided her with work that she could perform, it was a position unique to Coffman's circumstances and outside the normally assigned duties of any job classification at the University.

Because an employer is not required to create a special job for an employee who cannot do the one for which she was hired, we hold that the appellants were not obligated to retain Coffman in the unit position where she did only the "high work.[15]

Having concluded that the appellants did not discharge Coffman in violation of the West Virginia Human Rights Act, we must determine whether the lower court erred in failing to direct a verdict in favor of the appellants. This Court has established several guidelines for determining under what circumstances a directed verdict is appropriate. For example, a court may properly direct a verdict for the defendant where, "if the case were permitted to go to the jury upon the plaintiff's evidence, the same would not justify a verdict for the plaintiff, and if such a verdict were returned, the same would have to be set aside." *Porter v. South Penn Oil Co.*, 125 W.Va. 361, 24 S.E.2d 330, 331 (1943). Similarly, "[w]hen the evidence, though conflicting as a whole, embraces uncontradicted facts and circumstances which cause the case to turn in favor of one of the parties, so that a verdict adverse to such party cannot stand, the court should direct a verdict in his favor." Syl. pt. 6, *Lightner v. Lightner*, 146 W.Va. 1024, 124 S.E.2d 355 (1962). However, this

---

Service's justification for refusing reassignment was made stronger in this case since it was bound by the agreement. *Id.* at 467.

13. *But see Ignacio v. U.S. Postal Service*, 30 M.S.P.R. 471 (Spec.Pan.1986). In *Ignacio*, the Special Panel, applying an "any reasonable basis" standard, upheld an EEOC decision which required a job transfer as a "reasonable accommodation." 30 M.S.P.R. at 486. We, however, like other courts which have considered it, reject the position taken by the EEOC in *Ignacio*. *See, e.g., Carter v. Tisch*, 822 F.2d at 468.

14. *See* Regulation 4.03(2). Regulation 4.03(2) provides that "[a]n employer shall make reasonable accommodation to the known physical and mental impairments of qualified handicapped applicants or employees *where necessary to enable a qualified handicapped person to perform the essential functions of the job.*" (emphasis added). We, however, note that "[a]n employer shall not be required to make such accommodation if s/he can establish that the accommodation would be unreasonable because it imposes undue hardship on the conduct of his or her business." *Id.*

15. In an amicus curiae brief the West Virginia Advocates for the Developmentally Disabled, the West Virginia Trial Lawyers Association, and the West Virginia Chapter of the National Lawyer's Guild argue that because of the sheer size of the West Virginia University custodian work force and the variety of activities performed by custodians, permanent reassignment to the unit position involving only "high" work was not unreasonable. The parties argue that, unlike an employer with only a handful of employees, West Virginia University, one of the State's largest employers, was in a better position to accommodate Coffman by placing her in a custodial position different from the one for which she was hired. We disagree. Regardless of the plethora of duties which may be classified under a particular job title, reasonable accommodation does not require an employer, irrespective of its size or hiring capabilities, to create a new position within the job description consisting only of those duties which the handicapped employee can perform. Therefore, although the Custodian I job description may have encompassed the duties involved in the unit position to which Coffman was assigned, the appellants were not required to retain her in that position.

Court has recognized that rules concerning when a verdict should be directed in favor of one of the parties "are at best general rules which do not provide a specific formula, rather they provide broad guidelines on which the evidence must invariably be reviewed by both trial courts and appellate courts." *Wager v. Sine*, 157 W.Va. 391, 201 S.E.2d 260, 265 (1973).

As stated above, the evidence in this case can lead to no conclusion other than that, despite reasonable accommodation by the appellants, Coffman was unable to perform her job as a Custodian I. When the trial court failed to reach this conclusion as a matter of law, the jury was improperly permitted to consider Coffman's reassignment to the unit position where she did only the "high work" as reasonable accommodation. Because we find that reasonable accommodation does not include assignment to a new or different job, we conclude that the lower court erred in failing to direct a verdict for the appellants.[16]

For the foregoing reasons, the judgment of the Circuit Court of Monongalia County is reversed, the verdict is set aside, and the case is remanded with instructions to enter judgment in favor of the appellants.

Reversed and remanded.

MILLER, Justice, dissenting:

My dissent is to the majority's cavalier determination that as a matter of law, Ms. Coffman cannot obtain the benefits of her jury award. This is not based on any legal error, but rather is a judgment by the majority that the evidence was insufficient. This conclusion is based on a most cursory analysis of the facts which largely ignores the plaintiff's evidence, including the testimony of her rehabilitation expert. Furthermore, it is distressing to me that in our first handicap discrimination case, we should make such a superficial examination of the law and factual issues.[1]

I.

The West Virginia Human Rights Act (HRA) was amended in 1981 to provide for rights to the handicapped,[2] and in this amendment, W.Va.Code, 5–11–9(a) (1981), this language was used:

> "It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions:

> "(a) For any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or handicapped: Provided, That it shall not be unlawful discriminatory practice for an employer to observe

---

**16.** No party has challenged the fact and we, therefore, acknowledge that Coffman was handicapped as defined by West Virginia law. We, however, note that she became handicapped as a result of an injury sustained on the job during the course of her employment. In this regard, we are concerned as to why Coffman did not pursue a claim for workers' compensation benefits beyond the 30–day period of temporary total disability. The appellants do not raise the issue of workers' compensation and we, therefore, do not address it. We note that the intent of the legislature inherent in the enacting of the handicapped provisions of the West Virginia Human Rights Act was to assure equal opportunities for the handicapped in housing and employment. W.Va.Code § 5–11–2. Thus, we cannot conclude that the legislature intended the handicapped provisions of the West Virginia Human Rights Act as an alternative source of compensation for injuries sustained on the job.

**1.** It has been estimated that there are some twenty-two million physically disabled persons in the United States, yet less than 5 percent of them are employed. The human and economic cost of this unemployment is obvious and disturbing. *Holland v. Boeing Co.*, 90 Wash. 2d 384, 388 n. 1, 583 P.2d 621, 623 n. 1 (1978) (*citing* Note, *Abroad in the Land: Legal Strategies to Effectuate the Rights of the Physically Disabled*, 61 Geo. L.J. 1501 (1973); *Equal Employment and the Disabled: A Proposal*, 10 Colum. J.L. & Soc. Probs. 457 (1974)). *See also* Nichols, *Iowa's Law Prohibiting Disability Discrimination in Employment: An Overview*, 32 Drake L.Rev. 273 (1983); Note, *Accommodating the Handicapped: The Meaning of Discrimination Under Section 504 of the Rehabilitation Act*, 55 N.Y.U.L.Rev. 881 (1980).

**2.** 1981 W.Va. Acts ch. 128.

the provisions of any bona fide pension, retirement, group or employee insurance, or welfare benefit plan or system not adopted as a subterfuge to evade the provisions of this subdivision[.]"[3]

The term "handicap" is defined to mean "any physical or mental impairment which substantially limits one or more of an individual's major life activities."[4]

The majority refers to the Human Rights Commission regulations, pointing out in note 4 that "[a]lthough not raised by the parties," their effective date was "August 1, 1982, approximately six months after the appellants terminated Coffman's employment." The majority overlooks the fact that the trial court, by order entered November 17, 1986, prior to the trial, ruled that the plaintiff could not rely on the regulations. The majority utilizes the regulations without any explanation as to how they can be used on appeal when they were blocked out of the trial by the circuit court's order.

There is some authority for applying subsequently promulgated regulations. The United States Supreme Court in *Southeastern Community College v. Davis*, 442 U.S. 397, 404, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980, 987 (1979), noted that the appeals court had applied "administrative regulations that had been promulgated while the appeal was pending." The Supreme Court then went on to discuss the regulations in reaching its conclusions as to the proper scope of the handicap law.

It should be pointed out that independently of the Commission's regulations, the right to reasonable accommodation is a con-

cept inherent in the handicap statute. Our statute parallels to a substantial degree the Rehabilitation Act, which states in material part:

"No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794 (1973).

The federal act's key definition of "handicap" is "a physical or mental impairment which substantially limits one or more of such person's major life activities[.]" 29 U.S.C. § 706(7)(B) (1973).[5]

The Supreme Court in *Davis*, 442 U.S. at 412–13, 99 S.Ct. at 2370, 60 L.Ed.2d at 992, apart from any statutory language, pointed to a right of reasonable accommodation:

"Such advances also may enable attainment of these goals without imposing undue financial and administrative burdens upon a State. Thus, situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory. Identification of those instances where a refusal to accommodate the needs of a disabled person amounts to discrimination against the handicapped continues to be an important responsibility of HEW."

The right of reasonable accommodation was made even plainer in *School Bd. of Nassau County, Florida v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 1131, 94

---

**3.** The HRA was amended in 1973 to preclude discrimination against the handicap of blindness only. 1973 W.Va. Acts ch. 25. Blindness is separately defined. W.Va.Code, 5–11–3(s).

**4.** Both the prohibition against employment discrimination of the handicapped, W.Va.Code, 5–11–9(a), and the definition of "handicap" have remained unchanged since 1981. W.Va.Code, 5–11–3(t).

**5.** The federal act's definition of a "handicapped individual," in material part, is:

"[T]he term 'handicapped individual' means any individual who (i) has a physical or mental disability which for such individual consti-

tutes or results in a substantial handicap to employment and (ii) can reasonably be expected to benefit in terms of employability from vocational rehabilitation services provided pursuant to subchapters I and III of this chapter.

\* \* \* \* \* \*

... [F]or the purposes ... of this chapter, 'handicapped individual' means any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." The Rehabilitation Act of 1973, 29 U.S.C.S. § 706(7) (1974).

L.Ed.2d 307, 321 (1987), where the Supreme Court in note 17 stated:

"When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions. Ibid. Accommodation is not reasonable if it either imposes 'undue financial and administrative burdens' on a grantee, *Southeastern Community College v. Davis, supra* ... or requires 'a fundamental alteration in the nature of [the] program.' *Id.*, [442 U.S.] at 410 [99 S.Ct. at 2369]."

State courts have also reached the conclusion that under the general language of a handicap statute, a right of reasonable accommodation is implied. *Cerro Gordo County Care Facility v. Iowa Civil Rights Comm'n*, 401 N.W.2d 192, 196 (Iowa 1987); *Holland v. Boeing Co.*, 90 Wash.2d 384, 388–89, 583 P.2d 621, 623 (1978) (En Banc). Thus, it is clear that apart from any express statutory language, a right of reasonable accommodation does exist. For this reason, I agree with the majority's conclusion in Part I and in Syllabus Point 1 to the extent that the concept of reasonable accommodation is a part of the handicap statute. Contrary to the majority's assertion, I am not even sure that the Board disputed this conclusion as it stated on page 12 of its brief:

"Where an employe[e] or applicant is found to be a 'qualified handicapped person,' the employer is required to make 'reasonable accommodation' for the known physical or mental impairments of that person, to the extent possible without imposing undue hardship on the conduct of the employer's business."

## II.

The heart of my dissent lies in the mistreatment of the facts of this case in order to come to the conclusion that the trial court should not have let the case go to the jury. As previously pointed out, the majority makes only a cursory analysis of the facts and ignores most of the plaintiff's evidence.[6]

The majority states at the outset that as a matter of law the plaintiff could not perform the "essential functions" of a Custodian I, and disposes of the case based upon several federal court decisions under the Rehabilitation Act of 1973, 29 U.S.C.A. § 701, *et seq.* These cases hold that the duty of reasonable accommodation does not require an employer to reassign a handicapped employee to another position where the handicapped employee can no longer perform with reasonable accommodation the essential duties of the position for which the worker was hired.[7] This legal conclusion provided the sole basis upon which the majority overturned the jury's verdict and directed a verdict for the employer.

The majority's result is wrong for two reasons. First, the cases relied on by the majority, with one exception, were all decided before *School Bd. of Nassau County, Florida v. Arline, supra*, which recognizes that as a part of the concept of reasonable accommodation, alternative employment opportunities must be explored:

"Employers have an affirmative obligation to make a reasonable accommodation for a handicapped employee. Although they are not required to find another job for an employee who is not qualified for the job he or she was doing, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies." 480 U.S. at 289 n. 19, 107 S.Ct. at 1131 n. 19, 94 L.Ed.2d at 321 n. 19.

Second, as the facts were developed below, when Ms. Coffman came back to work on December 18, 1981, she was able to perform her assigned tasks. These tasks

6. Most of the majority's factual analysis is contained in note 10 of the majority opinion.

7. *E.g., Carter v. Tisch*, 822 F.2d 465 (4th Cir. 1987); *Carty v. Carlin*, 623 F.Supp. 1181 (D.Md. 1985); *Wimbley v. Bolger*, 642 F.Supp. 481 (W.D.Tenn.1986); *Bento v. I.T.O. Corp.*, 599 F.Supp. 731 (D.R.I.1984); *Alderson v. Postmaster General*, 598 F.Supp. 49 (W.D.Okla.1984).

were performed by Ms. Coffman working in tandem with a coworker, resulting in an efficient method of room cleaning. This arrangement was terminated by the hospital without any showing that it was inefficient or more expensive.

The central issue in this case was what were the essential functions of a Custodian I. The majority decided this critical factual issue by looking exclusively at the "job description" introduced into evidence. The record, however, reveals that this document, entitled "Custodian I Light Duty," was not intended to be a description of the duties the plaintiff was hired to perform.

Mr. Thomas S. Serpento, the director of the Office of Personnel for West Virginia University, testified that the document he prepared was intended to serve as a generic or master design of all Custodian I Light Duty positions throughout the university where custodians were employed. It was not a position description specifying the individual duties and responsibilities that a person hired as a Custodian I must fulfill. He stated that this generic job description was utilized not only by the hospital, but also by the housing department, the physical plant, and other areas where Custodian I's and Custodian II's were utilized. He reiterated that it is not a description of a "position that a person fills." He also acknowledged that not all custodians perform each and every one of the duties specified in the job description, such as emptying trash cans.

The plaintiff testified that the majority of the tasks listed in the generic job description were not performed by Custodian I's who worked in her area of the hospital. In practice, employees in this job classification perform different functions, not all of which require the same level of physical demands. Paradoxically, the record reflects that a reasonable accommodation had been made by the employer which had enabled the plaintiff to fulfill her work in a satisfactory manner, and yet notwithstanding this evidence, she was terminated.

The work plaintiff had been performing when she was terminated was ordinarily assigned to a group of custodians, with each patient room being cleaned by one worker. The plaintiff, after her return to work following her work-related injury, was assigned to assist another custodian in cleaning the rooms. The plaintiff did the "high work," which generally involved cleaning the mirror and sink and assisting the other custodian in changing and making the bed. The other custodian would ordinarily do the "low work," which involved cleaning the floor around the bed and the commode. The plaintiff testified that her coworker had kept records, which indicated that they were doing more work as a team than was being done by individual workers. She also expressed her belief that she was completing sufficient work and was "doing a job."

This was confirmed by the plaintiff's vocational expert, who testified that West Virginia University employed some 462 persons in the Custodian I job category. The expert believed that the job the plaintiff was performing when she was terminated was not a "make work" job. She stated that the partnership arrangement which the plaintiff was doing was a form of reasonable accommodation for the employee. The expert also stressed that the plaintiff was required to lift only waste baskets, which were not ordinarily heavy. She also believed that in such a large facility, there must have been extensive office areas where the plaintiff could have been assigned to do dusting and where only light lifting would ordinarily be found. She believed these were reasonable opportunities for restructuring the plaintiff's job, which could have been undertaken without undue hardship to the employer in terms of expense or loss of productivity.

What constitutes the essential functions of a job can become the key factual issue in handicap discrimination cases. This was particularly true here, as the custodial work was performed by a number of people who performed a variety of cleaning tasks. The essential job function was the primary issue in *Simon v. St. Louis County, Mo.,* 656 F.2d 316 (8th Cir.1981), *cert. denied,* 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982). There, a police officer sustained

substantial physical impairment from a gunshot wound and was diagnosed as being paraplegic. He was terminated and was denied reinstatement a few years later on the basis that this medical condition prevented him from fulfilling the duties of a police officer.

The district court found reasonable accommodation was not possible and entered judgment for the defendant. As in our case, there was evidence indicating that not all police officers were required to perform all the duties the employer maintained were essential. The court of appeals reversed the district court and remanded with the following instructions:

> "On remand, the district court should consider whether the requirements for police officers of St. Louis County, as testified to at trial by Colonel Kleinknecht, are reasonable, legitimate, and necessary requirements for all positions within the department. The district court should determine whether the ability to make a forceful arrest and the ability to perform all of the duties of all of the positions within the department are in fact uniformly required of all officers. If not uniformly required, they should not be considered actual requirements for all positions. Also, consideration should be given to Simon's actual physical condition in combination with Simon's police experience, and further determinations made as to exactly what functions within the department he has the physical abilities to perform. Finally, the court should determine whether the accommodations necessary in order to employ Simon as a commissioned police officer are unreasonable." 656 F.2d at 321. (Footnote omitted).

Another similar case is *Ackerman v. Western Elec. Co., Inc.,* 643 F.Supp. 836 (N.D.Cal.1986), which involved an employee with an asthmatic condition, who was terminated from employment after physicians indicated she should not perform strenuous physical activity and should avoid exposure to dust. The court, after making a detailed factual analysis of the employer's work assignment system and the nature of the job tasks actually performed by persons in the plaintiff's job classification, found that the plaintiff could perform the essential functions of the position with reasonable accommodation.

The plaintiff in *Ackerman* was an installer. After some three years of employment, she had achieved Index Level 2 status in a job classification system containing five levels. Electrical installation work was performed by crews of thirteen to eighteen installers, which included installers of various index levels of skill and ability. The tasks that were inconsistent with the plaintiff's work restrictions involved iron work and cabling. The court found that while these tasks were essential functions to be performed by the group, these functions were not essential to any particular individual's performance of the job. Given the flexibility in the company's work assignment system and the facts that work involving heavy exertion and that dust exposure formed such an insignificant portion of the total job performed by the plaintiff, the court concluded that these tasks were not an essential function of her job.

In *Ackerman,* the court found that the plaintiff had proven a prima facie case by demonstrating that she could perform the essential functions of the position with reasonable accommodation to her handicap. The reasonable accommodation involved the employer permitting her to wear a simple paper mask, the reassignment of job duties involving cabling or iron work so that she would not be required to pull or lift more than twenty-five pounds, and the elimination of one particular function entirely. The court found that the "[w]ork modifications proposed by [the plaintiff] would entail assignment to others of only particularly strenuous tasks representing historically an insignificant percentage of [her] work." 643 F.Supp. at 847. In rejecting the employer's undue hardship defense, the *Ackerman* court stated:

> "[T]he mere fact that accommodation might involve the reassignment (even if preferential) of some duties to other employees does not alone establish undue hardship. . . .

"The burden is on the Company to come forward with evidence showing that the accommodation sought is either unduly costly or burdensome or would so restructure the position that essential functions would have to be performed by others." 643 F.Supp. at 851.

*See also Trimble v. Carlin,* 633 F.Supp. 367 (E.D.Pa.1986); *Guinn v. Bolger,* 598 F.Supp. 196 (D.D.C.1984); *Commonwealth v. Pennsylvania Human Relations Comm'n,* 84 Pa.Commw. 98, 480 A.2d 342 (1984), remanded on other grounds, 510 Pa. 401, 508 A.2d 1187 (1986).

The Supreme Court of Iowa recently discussed the concept of reasonable accommodation in *Cerro Gordo County Care Facility v. Iowa Civil Rights Comm'n, supra,* a case involving an employee who began experiencing seizures which interfered with his job duties. The court found that the employer had made reasonable accommodations by transferring the handicapped worker to another position. The following passage is instructive:

"Discrimination against the disabled differs from other types of discrimination in that other types, such as racial, religious, or sex discrimination, usually bear no relationship to the individual's ability to perform a job. Consequently, it is necessary to provide a requirement of reasonable accommodation in order to eliminate discrimination against the disabled.... Determining the extent to which an employer must reasonably accommodate a disabled employee is a difficult problem.

\* \* \* \* \* \*

"Reasonable accommodation by the employer may take many forms. It is only required to an extent that a refusal to provide some accommodation would be discrimination itself. The employer is required to act reasonably. Reasonableness, a flexible standard, must be measured not only by the disabled employee's needs and desires, but also by the economic and other realities faced by the employer. We may examine the employer's motive to determine whether the employer was moved by a discriminatory bias rather than business judgment." 401 N.W.2d at 196–97.

In this case, the plaintiff's assignment to perform "unit work" with a coworker could have been viewed by the jury to be a form of job restructuring, a form of reasonable accommodation recognized in the law, not a transfer to a distinctly new or different job. The duties she performed—cleaning patient rooms and changing bed clothes—were all normal duties performed by persons in the Custodian I job classification. This critical factual distinction was not recognized by the majority.

The courts generally agree that once the handicapped worker has established a prima facie case of wrongful termination, the employer has the burden of showing that the worker cannot perform the job even with reasonable accommodation or that such accommodation would constitute an undue hardship to the employer's business. *Prewitt v. United States Postal Serv.,* 662 F.2d 292 (5th Cir.1981); *Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1249–50 (6th Cir.1985); *Gardner v. Morris,* 752 F.2d 1271, 1280–81 (8th Cir.1985); *Mantolete v. Bolger,* 767 F.2d 1416 (9th Cir.1985); *Pushkin v. Regents of the Univ. of Colorado,* 658 F.2d 1372 (10th Cir.1981); *Treadwell v. Alexander,* 707 F.2d 473 (11th Cir. 1983). *See generally* Annot., 80 A.L.R.Fed. 830 (1986); Annot., 90 A.L.R.3d 393 (1979).

State courts have arrived at this same conclusion, as illustrated by this passage from *B & O Railroad Co. v. Bowen,* 60 Md.App. 299, 311, 482 A.2d 921, 927 (1984):

"Various other cases have also placed the burden on the employer to show a reasonable probability that an employee's handicap would render him unable to perform his duties or to perform them without endangering his health or safety or that of others. *See Higgins v. Maine Central Railroad Co.,* 471 A.2d 288 (Me. 1984); *Chicago & North Western Railroad v. Wisconsin Labor & Industry Review Commission,* 98 Wis.2d 592, 297 N.W.2d 819 (1980); *Dairy Equipment Co. v. Dept. of Industry, Labor & Human Relations,* 95 Wis.2d 319, 290

N.W.2d 330 (1980); *Kimmel v. Crowley Maritime Corp.*, 23 Wash.App. 78, 596 P.2d 1069 (1969); *Panettieri v. C.V. Hill Refrigeration*, 159 N.J.Super. 472, 388 A.2d 630 (App.Div.1978); *Montgomery Ward v. Bureau of Labor*, 280 Or. 163, 570 P.2d 76 (1977); *Chicago, M. St. P. & P. RR. Co. v. Dept. of Industry, Labor & Human Relations*, 62 Wis.2d 392, 215 N.W.2d 443 (1974). In these cases, the courts have recognized that it is only fair to impose such a burden of proof on the employer, who has special knowledge, expertise, and facts within his control not only to determine the qualifications for the particular job but also to know what the physical demands of that job would entail." 482 A.2d at 927.

*See also Maine Human Rights Comm'n v. Canadian Pacific Ltd.*, 458 A.2d 1225 (Me. 1983).

Finally, it must be emphasized again that the factual issues in this case were for the jury. No claim is made that the trial court erroneously instructed the jury. I am simply appalled that the verdict in this case, which was fairly tried by a judge that handled the issues in an extremely competent fashion, should not only be set aside, but pronounced as factually unsupportable. This conclusion flies in the face of our traditional rule for testing the sufficiency of a jury verdict on appellate review, as set out in Syllabus Point 5 of *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984):

"In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved."

*See also* Syllabus Point 6, *McClung v. Marion County Comm'n*, 178 W.Va. 444, 360 S.E.2d 221 (1987); Syllabus Point 4, *West Virginia Dept. of Highways v. Roda*, 177 W.Va. 383, 352 S.E.2d 134 (1986); *Hardman Trucking, Inc. v. Poling Trucking Co., Inc.*, 176 W.Va. 575, 346 S.E.2d 551 (1986); Syllabus Point 2, *Miami Coal Co., Inc. v. Hudson*, 175 W.Va. 153, 332 S.E.2d 114 (1985).

### III.

Finally, I am at a loss to understand footnote 16 of the majority's opinion. It seems to suggest that the legislature did not intend to accord handicapped workers any rights if they were injured on the job. This, according to the majority, is because the injured worker can obtain workers' compensation benefits, and, therefore, the majority intones: "[W]e cannot conclude that the legislature intended the handicapped provisions of the West Virginia Human Rights Act as an alternative source of compensation for injuries sustained on the job."

This statement is so outrageously fallacious that it is hard to believe that it was meant to be taken seriously. First, workers' compensation benefits are for the medical and hospital expenses incurred from the injury. *Cropp v. State Workmen's Compensation Comm'r*, 160 W.Va. 621, 236 S.E.2d 480 (1977). Temporary total disability benefits are paid while the injured worker is recovering and, thus, compensation to some extent is for loss of earnings. *Dunlap v. State Workmen's Compensation Comm'r*, 160 W.Va. 58, 232 S.E.2d 343 (1977). Awards for permanent disability are designed to reimburse the injured worker for the injury's impact on his physical and mental condition, as well as the impairment of his earning capacity and his ability to enjoy the normal pursuits of everyday life. *Posey v. State Workmen's Compensation Comm'r*, 157 W.Va. 285, 201 S.E.2d 102 (1973); *Walk v. State Compensation Comm'r*, 134 W.Va. 223, 58 S.E.2d 791 (1950). It is obvious that workers' compensation benefits relate to the employee's injuries and have nothing to do with his status under the handicap law. This latter provision is designed to prevent

discrimination against a person who has a handicap.

The potential for handicap discrimination occurs when the injured employee is well enough to return to work and has a handicap as defined in the Act.[8] As cases recognize, the handicap can occur from a job-related injury,[9] a nonwork-related injury,[10] or a disease or other disorder.[11] In most cases, the employee is already employed when the disability arises, but, of course, the handicap law applies to new hirees.[12]

Nor is it possible to ascribe any legislative intent that employees handicapped as a result of occupational injuries were to be excluded from the coverage of the handicap discrimination law. The wording of the Act is very broad since it prohibits discrimination "with respect to compensation, hire, tenure, terms, conditions or privileges of employment[.]" The term "tenure" obviously applies to someone who has already been hired.

Moreover, any such construction as intimated by the majority would be contrary to the plain language of W.Va.Code, 23–5A–1

(1978), which prohibits discrimination for receiving or attempting to receive workers' compensation benefits: "No employer shall discriminate in any manner against any of his present or former employees because of such present or former employee's receipt of or attempt to receive benefits under this chapter." [13]

This type of issue has been raised in several cases, and the courts have had no difficulty in rejecting it on the basis that each statute is designed to accomplish distinctly different purposes. The Workers' Compensation Act affords compensation for a worker's injuries and permanent disabilities. The handicap provisions of the Human Rights Act enables him to continue in employment if his injuries do not prevent him from performing the essential functions of his job with the help of reasonable accommodation. *E.g., Boscaglia v. Michigan Bell Telephone Co.,* 420 Mich. 308, 362 N.W.2d 642 (1984); *Reese v. Sears, Roebuck & Co.,* 107 Wash.2d 563, 731 P.2d 497 (1982) (En Banc); *cf. Jones v. Los Angeles Community College Dist.,* 198 Cal.App.3d 794, 244 Cal.Rptr. 37 (1988).[14]

---

8. As earlier noted, the handicap definition is "any physical or mental impairment which substantially limits one or more of an individual's major life activities." W.Va.Code, 5–11–3(t).

9. *E.g., Simon v. St. Louis County, Mo., supra; Trimble v. Carlin, supra; Mackay v. United States Postal Serv., supra; Wardlow v. Great Lakes Express Co.,* 128 Mich.App. 54, 339 N.W.2d 670 (1983).

10. *E.g., Prewitt v. United States Postal Serv., supra; Hurst v. United States Postal Serv., supra; Baltimore & O.R.R. Co. v. Bowen, supra.*

11. *E.g., School Bd. of Nassau County v. Arline, supra; Gardner v. Morris, supra; Jasany v. United States Postal Serv., supra; Reynolds v. Brock,* 815 F.2d 571 (9th Cir.1987); *Treadwell v. Alexander, supra; Bento v. I.T.O. Corp. of Rhode Island, supra; Guinn v. Bolger, supra; Ackerman v. Western Elec. Co., Inc., supra; Cerra Gordo County Care Facility v. Iowa Civil Rights Comm'n, supra.*

12. *E.g., Prewitt v. United States Postal Serv., supra; Treadwell v. Alexander, supra; Bento v. I.T.O. Corp. of Rhode Island, supra; Baltimore &*

*O.R.R. Co. v. Bowen, supra; Andersen v. Exxon Co.,* 89 N.J. 483, 446 A.2d 486 (1982).

13. This concept is embodied in HRC Reg. 4.07, which states:

"PERSONS WHOSE HANDICAP ARISES DURING EMPLOYMENT—When an individual becomes handicapped in the course of employment, the employer shall, if possible, through reasonable accommodations, continue the individual in the same position or reassign the employee to a new position for which s/he is qualified or for which, with training, s/he may become qualified. The requirements of this paragraph shall be interpreted in such a way as to be consistent with section one, article five-a, chapter twenty-three of the West Virginia Code which prohibits employers from discriminating against employees because they have applied for or received Workers' Compensation benefits." 77 C.S.R. 1 (Series I 1982).

14. The Wisconsin Court of Appeals declined to find a dual right, but this was because its workers' compensation act had a specific antidiscrimination provision. *Schachtner v. Dept. of Industry, Labor & Human Relations, Equal Rights Div.,* 144 Wis.2d 1, 422 N.W.2d 906 (1988).

For the foregoing reasons, I dissent and I am authorized to state that Justice McGraw joins me in this dissent.