James ALDERSON, Plaintiff,

v.

POSTMASTER GENERAL OF the
UNITED STATES, Defendant.

No. CIV–81–1454–D.

United States District Court,
W.D. Oklahoma.

Aug. 21, 1984.

Jim Grennan, Oklahoma City, Okl., for plaintiff.

William S. Price and Eleanor Thompson, Oklahoma City, Okl., William H. Brown, Jr., Memphis Tenn., Kevin B. Rachel, U.S. Postal Service, Washington, D.C., James D. Burroughs, U.S. Postal Service, New York City, for defendant.

OPINION

DAUGHERTY, District Judge.

This matter was tried to the Court sitting without a jury on July 19–20, 1984. The Court has weighed the evidence and, upon considering the contentions of the parties, including post-trial letters from Counsel, the Court finds and concludes as follows:

Plaintiff brings this action for reinstatement and back pay. He alleges that the Defendant discriminated against him by reason of a handicap or a perceived handicap, in violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq. (the Act).

The operative prohibitory section of the Act, 29 U.S.C. § 794, provides in pertinent part:

No *otherwise qualified* handicapped individual in the United States, as defined in section 706(7) of this Title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive Agency or by the United States Postal Service. [emphasis added]

The term "handicapped individual" is defined in 29 U.S.C. § 706(7)(B) as:

"any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."

Pursuant to statutory authority, the Equal Employment Opportunity Commission issued regulations interpreting the Act, including a definition of the term "major life activities" as including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1613.-702(b), (c).

The Plaintiff contends that at the time he was fired by the Defendant Postal Service, he was a "handicapped individual" within the meaning of the statute. Specifically, the Plaintiff has variously contended that he was fired (1) because he had an actual, substantially limiting physical impairment and (2) because, while he had no such actual impairment, the Defendant regarded him as having such an impairment. The Plaintiff's pleadings herein clearly allege the "actual impairment" contention, but the pretrial order clearly indicates that the "perceived impairment" contention (factual issue (1)(c) in the pretrial order) is also in issue. Hence, although defense counsel expressed surprise in closing arguments that the "perceived impairment" contention was in issue, the Court must deal with that issue under the above circumstances. Further, although Plaintiff's counsel seemed in closing arguments to deemphasize, if not abandon the "actual impairment" contention, the Court will treat it as still being in issue, as it was clearly pleaded, there was evidence to support it, and the Plaintiff in closing arguments continued to assert that he was entitled to "reasonable accommodation" on account of it. Plaintiff's "reasonable accommodation" contention, which is grounded on the regulation 29 C.F.R. § 1613.704, would seem to assume that he was fired because of an actual, rather than a perceived, handicap, but the Plaintiff, in his February 21, 1984 response to Defendant's Motion for Summary Judgment (at 4–5), has argued that he was entitled to accommodation if he was either actually or perceivedly handicapped.

Plaintiff was hired by the Postal Service as a City letter carrier on a part-time flexible schedule basis and subject to a 90-day probationary period, beginning June 28, 1980. Under the applicable collective bargaining agreement, such a probationary employee may be separated at any time without access to the grievance-arbitration

procedure. Plaintiff was assigned to the Del City Station under the supervision of Carl A. Weckenmann. Plaintiff received training from a nonsupervisory letter carrier, William Richter. Messrs. Weckenmann and Richter both testified very credibly at trial regarding the job performance of the Plaintiff. The essential elements of the City letter carrier job were the collection, "casing," and delivery of the mail. Collection and delivery are done on routes, while "casing" is done at a postal service center. "Casing" consists of picking up magazines and letters from a long table and reaching up with the individual items and putting them in the proper slots in the case. The slots are organized in the order in which they are to be delivered on the delivery route. Ordinarily, the casing and delivery functions are joined so that a carrier spends per working day approximately two and one-half hours casing the mail in order to put it in the order of delivery, and then the carrier spends approximately five-and-a-half hours delivering the mail. The casing function requires standing in front of the case, picking up the mail, moving back and forth and reaching to the slots in order to sort or arrange the mail. It also requires, in order to be efficient, a fairly aggressive effort to work rapidly, and the Postal Service considers the standard rate of casing to be 18 pieces of first class mail per minute or 8 magazines per minute. An experienced letter carrier is expected to reach this speed on a case which is new to him within two weeks, but an inexperienced carrier is expected to achieve that speed a little more slowly. While a new carrier is expected to be slower than an experienced carrier would be on a new case, the Plaintiff was one of the slowest new men ever observed according to testimony by Mr. Richter and Mr. Weckenmann. Both Mr. Richter and Mr. Weckenmann gave Plaintiff express instructions as to how to speed his casing, and the Plaintiff ignored and refused to follow these instructions, including an instruction from Mr. Richter that he should pick up and hold the mail in his left hand and slot it with his right hand, whereas, the Plaintiff insisted on picking up the mail with both hands. The Plaintiff also did not try hard to do his job but withheld effort. When Mr. Richter was showing him how to case mail, he held back to let another do the work while he watched rather than plunge in and show that he could do the job. Mr. Richter told the Plaintiff during this training that he would have to case mail faster.

Mr. Richter also trained the Plaintiff in delivering the mail. This consisted of taking him on a "park and loop" route, in which the carrier drives to a location with cased mail in a Jeep, parks the vehicle, and carries part of the mail on a walking route that begins at the parking spot and returns thereto. The typical "park and loop" route consists of 600–800 houses and requires delivering approximately a 100 or more houses per hour. Mr. Weckenmann, as part of his expressly required duties, observes his carriers on their routes in order to check their speed of progress, and on the Plaintiff's last day, July 16, 1980, he observed the Plaintiff at 12:15 p.m. and 4 p.m. at points on Plaintiff's route which indicated that he had delivered only approximately 100 houses in a time span when he should have delivered several times that number. Prior to Mr. Weckenmann's thus checking on Plaintiff's progress, Mr. Richter remarked to Mr. Weckenmann that the Plaintiff "would never make it."

The accident involved herein occurred at approximately 4 p.m. on July 16, 1980. Plaintiff was walking his route when he was accosted by a large dog. The Plaintiff had been given cards to inform him where the vicious dogs were, but there was no credible evidence as to whether he had a card on that dog on that day. Plaintiff was also given as a matter of course a can of dog spray or "mace." He had been instructed that when accosted by a hostile dog, he should put his mail bag between him and the dog and fend it off rather than allow the dog to chase him. This was a standard safety procedure, and the Plaintiff violated it. He failed to put the bag between him and the dog and allowed the dog to chase him. He fell over something,

which he testified at trial was a hedge. The fall twisted his knee and thereby injured it. He walked a couple more blocks on his route and returned to the station complaining of his knee and gave the remainder of his mail to other carriers to complete his route.

The following day, the carriers who delivered that route picked up dozens of misdelivered pieces of mail, enough to make a "handful." This was a very excessive number of misdelivered pieces, even for a new man.

During his orientation, the Plaintiff was informed that a carrier in his position was expected to deliver the mail promptly in all kinds of weather conditions and that the job was typically arduous, as it involved hefting and walking with bags full of mail. The Plaintiff understood and signed a statement to this effect and accepted the part-time flexible-schedule (PTF) position. The PTF position meant that he was on call at the request of his supervisor, but after working a day or two, the Plaintiff refused a request to work, asserting that he was sick with a sore throat. A day or two later during his training time, Mr. Weckenmann talked him into working even though he again claimed to have a sore throat. A sore throat is considered by the Postal Service to be a minor ailment that does not interfere with mail delivery or the performance of the carrier's duty. The Plaintiff testified that the outside temperature in the afternoon about this time was at the 106° Fahrenheit level, but this was not a sufficient excuse for lack of full performance by the carrier, in the view of the Postal Service.

Following his injury, the Plaintiff promptly filed a Federal Employees Worker's Compensation claim and went to a Dr. McCown, a Board Certified orthopedist. He first saw Dr. McCown on July 17, 1980. Dr. McCown noted that he claimed never to have had previous problems with his right knee, that the collateral ligaments were stable, and that x-rays showed a little squaring off of the medial femoral condyle which would suggest possibly an old previous problem, but the Plaintiff denied to Dr. McCown that he had such history. Dr. McCown's impression was of a possibly damaged meniscus of the right knee. Dr. McCown treated him with a splint and gentle exercise and discouraged returning to work until reexamination in one week. At the second examination, Dr. McCown noted that the knee was better and encouraged Plaintiff to do his exercises, to get rid of his knee brace, and to be less fearful. At the third and final appointment, Dr. McCown noted that the knee continued to improve and had full motion, even though the Plaintiff was not doing his strengthening exercises as instructed. Dr. McCown found loose ligaments on both knees but no meniscus problem. He returned the Plaintiff "to full work duty activities without restrictions." He offered to do an additional test, which was refused, and indicated there appeared to be no permanent impairment but that the case should remain open.

The Plaintiff testified that Dr. McCown released him to return to work because he, the Plaintiff, requested such release. The Plaintiff also testified that he promptly called Mr. Weckenmann and informed him that he could return to work and was then told that he was being terminated. The Plaintiff identifies this conversation as being on August the 4th or 5th, while Mr. Weckenmann places a similar conversation on different dates, but this discrepancy is immaterial. It is however significant that from the date of injury to August the 4th, the Plaintiff continued to receive full pay under the Federal Worker's Compensation Program, which indicates, in the Court's opinion, that the Plaintiff considered his injury to be sufficiently healed that he could return to the physically demanding work of the mailman on foot.

■ Following the Plaintiff's July 17, 1980 examination by Dr. McCown, Dr. McCown sent a copy of his examination notes to the office of Workers Compensation in the Central Oklahoma City Post Office, and after his August 4, 1980 appointment, Dr. McCown sent a copy of his notes from all three sessions, which was

received in the compensation office on August 7th. In the meantime, Mr. Weckenmann reported the Plaintiff's injury on July 17, 1980 (Plaintiff's Exhibit 2), made a routine "30 day" evaluation report on July 29, 1980 (Plaintiff's Exhibit 5), and made a "45 day" evaluation report (Plaintiff's Exhibit 6) on August 2, 1980 upon request for a special (i.e. 45 day) report from the Central Oklahoma City office. Mr. Weckenmann's recommendations to terminate the Plaintiff were approved by his superiors, and Mr. Dudley, the Oklahoma City Postmaster, sent a termination notice dated August 14, 1980 to the Plaintiff, stating that his termination would be effective as of August 22, 1980. Not until August 19, 1980 did the Plaintiff go to Dr. Harsha for what Dr. Harsha terms "another opinion." None of Dr. Harsha's reports were seen by Postal Service employees prior to the August 14 decision by Mr. Dudley. Dr. McCown's findings were that the Plaintiff had apparently sustained a minor injury on July 16 but was fully recovered as of August 4th and could return to work as of that date without restrictions and having no disability. Dr. McCown's findings do not at all support the assertion that the Plaintiff was handicapped at any time, and there is no evidence that the Postal Service interpreted his findings as indicating a handicap. Although Dr. Harsha repeatedly found that the July 16th affair with the dog caused the Plaintiff to be unable to do letter carrier duties, which findings Dr. Harsha always reported promptly to the Worker's Compensation Office, the Court is satisfied from the findings of Dr. McCown and the subsequent examinations by Dr. Bell and Dr. English that the Plaintiff was never handicapped in any sense prior to the termination decision of August 14, 1980. Nor did Postal Service employees infer from doctor reports that the Plaintiff was handicapped prior to the termination decision.

The Court also finds that the Postal Service management never believed that the Plaintiff was handicapped in any sense of the word. The Plaintiff has made much of the fact that the first written criticism of the Plaintiff which is in the record is a comment by Mr. Weckenmann on a routing slip attached to his July 17, 1980 report of the Plaintiff's injury (Plaintiff's Exhibit 2). But, in the Court's opinion, the main thrust of this comment is to suggest that the Plaintiff was not really injured but was malingering. Mr. Weckenmann says therein that the Plaintiff "states he was injured," that in nearly four hours on July 16, 1980 he observed the Plaintiff to have delivered approximately 100 residences "which normally takes 1 hour," and then goes on to say:

> I believe this injury should be controverted. He has only been employed at the Post Office approx 2 weeks. During this time he has stated that he had a sore throat on three different occasions. In my opinion this employee will never become satisfactory and should be terminated at the earliest possible.

Rather than suggest that Mr. Weckenmann thought that the Plaintiff was handicapped, this suggests that he thought the Plaintiff was an uninjured malingerer who did not like working in the very hot weather. Given the fact that Mr. Weckenmann was aware of the Worker's Compensation Program, he was probably aware that any genuine injury which occurred in the course of employment was compensable, and he evidently thought that this injury either was not real or was not incurred while working. The Plaintiff has argued that Mr. Weckenmann's notation on the July 29 and August 2 evaluations (Plaintiff's Exhibits 5 and 6) that, in the category of safety, the Plaintiff was unsatisfactory because he was "injured on the job" shows that Mr. Weckenmann's recommendation of termination was based on his perception that the Plaintiff was handicapped. Such assertion is not a fair inference from the comment, but even if it were fair, it is belied by the narrative explanation from Mr. Weckenmann on the July 29 evaluation, in which he comments that the Plaintiff "did not abide by safety instructions given him in his training." Considering this evidence and all the other evidence, the Court finds that neither Mr. Weckenmann

nor other Postal Service management perceived the Plaintiff at any time to be handicapped in any sense of that term and that his termination was not, even in part, because of or by reason of a handicap or a perceived handicap. The sole reason for his termination was their well-founded perception that the Plaintiff was performing poorly in his job and had an attitude which indicated that he would probably never perform well.

Based on these findings and the statutory and regulatory provisions quoted above, the Court concludes that the Plaintiff was not "handicapped" within the meaning of the Act. The Court further concludes that the Plaintiff was fired because of poor job performance and not because of any actual or perceived handicap and therefore is not entitled to the relief he seeks in this action.

### REASONABLE ACCOMMODATION

The findings and conclusions stated above moot the question of reasonable accommodation. As Plaintiff is neither handicapped nor perceived to be handicapped, he is not entitled to such accommodation. However, assuming that the Plaintiff had the actual or perceived handicap at the time he was fired, and further assuming that he was fired solely by reason of such handicap, the Court concludes that he would not be entitled to such accommodation.

The first reason for this conclusion is found in 29 U.S.C. § 794, quoted above. A handicapped individual who is "otherwise qualified" may not be discriminated against, but one who is not qualified is not protected thereunder. If the Plaintiff actually had the physical handicap claimed, he would not be able to do the physically arduous work of the City letter carrier. He would not be able to walk the necessary distances over the various terrain encountered carrying satchels full of mail. To do so in such circumstances would endanger his own health and safety, and the job could not be restructured to eliminate such walking and carrying without eliminating its essential features. The Supreme Court

has decided that the term "otherwise qualified" in the statute means that the handicapped person must be able to perform all of the job requirements "in spite of" his handicap. *Davis v. Southeastern Community College*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). The Supreme Court expressly rejected the view that the handicapped person was protected by the Act if he was able to meet all the requirements *except* as to limitations imposed by his handicap. If the Plaintiff in the instant case were handicapped, as claimed, by reason of having a tendency to be severely strained or dislocated or twisted in the knee, sometimes as often as 20 times per year, as he testified, and requiring from days to months of recuperation for each occurrence, he would not be able to sustain the physical requirements of the City letter carrier position. In fact, it is extremely doubtful whether he could perform the function of casing the mail, which requires standing for two-and-a-half hours per day. The regulations promulgated by the Equal Employment Opportunity Commission are consistent with this conclusion. The term "qualified handicapped person" is defined in 29 C.F.R. § 1613.702(f) to mean:

> with respect to employment, a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others
> . . . .

Secondly, Plaintiff's assertion that he would be entitled to "reasonable accommodation" if the Defendant perceived him to be handicapped even if he was not actually handicapped is not well taken. The requirement that an agency make "reasonable accommodation" is found in the regulations, 29 C.F.R. § 1613.704(a), which provides:

> An agency shall make reasonable accommodation to the *known physical or mental limitations* of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hard-

ship on the operation of its program. [emphasis added]

The emphasized phrase in the quoted regulation clearly refers to an actual handicap rather than merely a perceived one. Certainly, it would be incongruous for the Court to find that the Plaintiff was "handicapped" within the meaning of the Act only because his employer regarded him as handicapped if the Court ordered that the Plaintiff was then entitled to some "accommodation." If the Plaintiff were capable but the employer perceived him as incapable, the Court would simply order the agency to recognize his capability.

Thirdly, even if the Plaintiff had been fired solely because of the claimed handicap, he would not be entitled, as an "accommodation" required by the regulations, to be assigned to a different job. The Court has been cited to no authority indicating such an entitlement. The Plaintiff cites the provision in 29 C.F.R. § 1613.-704(b) that accommodation may include "job restructuring." But there is nothing in that regulation which requires assignment to a different job. The cited regulation provides:

> Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

The quoted regulation clearly refers to making the particular job, not another job for which the handicapped person was not hired, accessible to handicapped persons. In fact, the primary relief which the Plaintiff desires to obtain by way of this lawsuit appears to be getting another job within the Postal Service, not reinstatement to the physically demanding job of letter carrier. When his own counsel asked if he were willing to take back his old job, he reluctantly testified that he would try. In contrast, he enthusiastically indicated that he would like to attempt the positions of post-al clerk, management, or postal inspector. However, even if Plaintiff were entitled to another job by way of "accommodation," there was no evidence as to whether he would qualify for such positions. The Plaintiff has argued that a letter from the Worker's Compensation Office to Dr. McCown indicating that "limited duty" assignments were available to a disabled employee indicated that the Postal Service did accommodate handicapped persons by placing them in "limited duty" or "light duty" positions. The conclusion does not follow, however. The Postal Service provides such assignments to disabled persons in order to reduce its losses while it continues the pay of a person entitled to Worker's Compensation payments. And, under the contract with the Union, the Postal Service provides "light duty" jobs to certain persons who apply for such duty, but the Plaintiff never applied for such jobs under the Union contract. Moreover, the "limited duty" provisions of the Worker's Compensation Program do not appear to be a right of the disabled worker, and in any case the instant lawsuit is not based on rights of the Plaintiff under the Worker's Compensation law or the Union contract. Hence, any such questions are not involved herein.

The Court concludes that the Plaintiff is entitled to no relief. Based on this Opinion, a separate Judgment will be entered by the Court.