**Constance GUICE–MILLS, Plaintiff,**

v.

**Edward J. DERWINSKI, Secretary of the Department of Veterans Affairs, Defendant.**

**No. 86 Civ. 0034 (BN).**

United States District Court, S.D. New York.

Sept. 6, 1991.

---

Moses & Singer, Cynthia Kern, New York City, for plaintiff.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., Victor Olds and Ping C. Moy, Asst. U.S. Attys., for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge, United States Court of International Trade, sitting as a United States District Court Judge by Designation:

### Introduction

Plaintiff, formerly a federal employee and Head Nurse at the Veterans Administration's Franklin Delano Roosevelt Hospital, Montrose, New York ("Hospital"), seeks an award of compensatory and punitive damages, injunctive and other relief against defendant, Secretary of the Department of Veterans Affairs, for alleged handicap discrimination pursuant to the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701 *et seq.* The court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. A bench trial was held on May 1 and 2, 1991, decision was reserved and the parties have filed post-trial submissions.

The primary issue to be resolved is whether plaintiff, who at the time of her employment by the Hospital received medical treatment for stress and depression, was an "otherwise qualified handicapped individual" but was denied reasonable accommodation by defendant. For the reasons that follow, the complaint is dismissed.

The following constitute the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

### Findings of Fact

1. Constance Guice–Mills holds a Bachelor of Science degree in Nursing from Meharry Medical College and a Master of Science degree in Psychiatric Nursing from

Hunter College. At the time of trial plaintiff was 55 years of age.

2. Plaintiff's professional experience is extensive and quite impressive: staff nurse, supervisory positions, psychiatric nursing instructor at the City University of New York and Pace University in New York City, Chairman of Psychiatric Nursing at the Beth Israel Medical Center School of Nursing, Supervisor of the Methadone Maintenance Training Program at Beth Israel Medical Center, Assistant Director of Psychiatric Nursing at Harlem Hospital, and Field Director of Community Mental Health in Westchester County, New York. There is no dispute regarding plaintiff's professional qualifications—which are obviously outstanding—to hold the position of Head Nurse.

3. In February 1980 plaintiff commenced her employment at the Hospital and in March 1980 assumed the position of Head Nurse. She worked in that capacity until April 1986, when she retired on a disability pension.

4. Shortly after assuming her duties as Head Nurse, plaintiff's interpersonal relations with her supervisors rapidly deteriorated, became extremely strained and contentious, with various charges and countercharges that need not be detailed. According to plaintiff's psychiatrist, Dr. Cynthia D. Barnes of New York City, in December 1980 "[plaintiff's] supervisors * * * were seeking to destroy her efforts *for reasons that were never objectively identified"* (pltf's exh. 8, p. 2, emphasis added). There can be no doubt whatever from the record that plaintiff suffered from stress and depression early on, dating back to at least 1980 when she sought treatment from the Hospital's personnel physician (pltf's exh. 6, pp. 1–2). Plaintiff's mental difficulties were significantly exacerbated by a strained relationship with her supervisors and, from plaintiff's perspective, a stressful environment at the Hospital dating back to 1980.

5. Commencing in January 1981, plaintiff began reporting to Dr. Berg, an internist and long-time family physician, complaints of severe anxiety, depression, insomnia and headaches, which plaintiff attributed to stress on her job (deft's exh. K).

6. In September 1981 plaintiff was reassigned to be Head Nurse of the Drug Dependency Treatment Center.

7. By 1984, following an allegedly unrelenting episodic history of brouhahas involving a number of personnel who set out to undermine plaintiff's professionalism, more charges and countercharges of misconduct and wrongdoing, plaintiff developed migraine headaches, severe anxiety and a major depressive episode, as described below (*see* pltf's exh. 8; deft's exh. K)). Plaintiff's anxiety and depression became progressively severe during 1984 and she sought further treatment from the personnel physician at the Hospital. Upon the advice of the personnel physician, plaintiff pursued continued treatment by Dr. Berg.

8. In June 1984, Dr. Berg diagnosed plaintiff as severely depressed. As part of her anxiety-depression syndrome, plaintiff experienced: feelings of hopelessness, malaise, insomnia, inability to get up in the morning, abnormally increased appetite with resultant binging and significant weight gain, chest pain, palpitations, extreme fatigue, listlessness, inability to concentrate, memory deficit (forgetfulness), irritability and a dread of going to work. Dr. Berg recommended that plaintiff take two months leave of absence from her job, initiated antidepressant drug therapy, and referred plaintiff to Dr. Arnold Gallo, a psychiatrist, who added sedatives to plaintiff's drug regimen (deft's exh. K).

9. During July and August 1984 plaintiff took the two months sick leave recommended by Dr. Berg. She returned to the Hospital in September 1984 and attempted to resume her normal duties. However, plaintiff's depressive symptomatology quickly recurred and in October 1984 she returned to Dr. Berg for further treatment. Dr. Berg found plaintiff to be still suffering from severe depression, particularly insomnia, extreme fatigue, lack of ability to concentrate and make decisions, listlessness—in short, great difficulty in carrying on her normal activities. Plaintiff complained to Dr. Berg of lack of support and

understanding from her co-workers and supervisors, hostility, and her belief she was under constant attack from which she needed to protect herself. Other symptoms reported by plaintiff included a complete loss of interest in activities—especially in good job performance—in which she had previously taken a great interest and derived satisfaction, feelings of extreme rage and anger directed at her supervisors and others, general malaise, occasional nightmares, appetite disturbance and weight gain, hopelessness, and especially almost a total inability to get out of bed and prepare herself to go to her job, which she felt had become intolerable.

10. Dr. Berg advised plaintiff to resume an extended indefinite leave of absence from her job, and again referred plaintiff to Dr. Gallo for reevaluation and drug therapy (deft's exh. K)

11. Plaintiff was granted an extended leave of absence—without pay—from February 8, 1985 to September 9, 1985 (approximately seven months)—after which plaintiff returned to the Hospital and resumed all her duties. At the time, plaintiff was active in patient treatment and was supervising five employees in her ward (pltf's exh. 5). While plaintiff was on her seven month leave of absence, the Head Nurse of an adjoining ward concurrently covered plaintiff's ward and the adjoining ward. Additionally, during plaintiff's long absence, a staff nurse in the drug unit, Violet Sheedy, assumed many of plaintiff's duties and was able to perform them well.

12. Unfortunately, plaintiff's depressive symptoms continued during her extended leave of absence, and in September 1985 plaintiff began treatment under the care of Dr. Barnes. Thereupon, Dr. Barnes wrote a detailed report concerning plaintiff dated November 20, 1985 (deft's exh. K) and more recently testified on behalf of plaintiff at trial in May 1991. The symptomatology reported by Dr. Barnes includes feeling of being unable to "go on," insomnia, extreme fatigue, lassitude, physical deterioration, substantial weight gain, loss of interest in everyday activities, malaise, difficulty in concentrating, feelings of isolation and betrayal by her supervisors and co-workers, crying spells, feelings of extreme anger and rage, hopelessness, occasional nightmares, enormous difficulty in getting out of bed in the morning and arriving at work with enormous dread. A major depressive episode, as listed in the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders III–R, includes many of plaintiff's symptoms.

13. Viewing plaintiff's mental distress as multifaceted, Dr. Barnes prescribed several psychopharmacologic modalities—Desyrel (for depression), Valium (for anxiety and agitation), and Fiorinal (for migraine headaches). These medications typically, as a side effect, leave many patients significantly sedated over an extended period of time. In point of fact, "Desyrel is one of the most sedating antidepressant medications" (deft's exh. Q, p. 3). However, given plaintiff's symptomatology prior to treatment with drugs, particularly her sleeping disturbances and inability to get up in the morning (she was never a "morning person," pltf's exh. C), plaintiff's assumption that her medications were *solely* responsible for her morning drowsiness and inability to arrive at work prior to 10:00 A.M. was erroneous. Dr. Barnes believed that a combination of depression and the medication accounted for plaintiff's morning problem (deft's exh. Q, p. 2).

14. "As all antidepressant medications are equally efficacious in combating depression, the prescription of an antidepressant is based primarily upon its side-effect profile" (deft's exh. Q, p. 3). Because sleep disturbance (particularly insomnia) and extreme anxiety were among plaintiff's chief complaints, Dr. Barnes selected a sedating antidepressant—Desyrel—as the medication of choice in plaintiff's case because of its tendency to relieve stress and induce sleep. After experimenting with different medication schedules, Dr. Barnes instructed plaintiff to take her complete daily dose of Desyrel at dinnertime to promote sleep through the night.

15. Shortly after her treatment commenced with Desyrel in September 1985, plaintiff found she was experiencing a

morning "hangover" effect. She found it virtually impossible to even get out of bed in the morning (see deft's exh. Q, pp. 2–3). However, as reported by plaintiff, even when she saw Dr. Berg, she complained of difficulty in getting up in the morning— viz., "never a morning person" (deft's exh. C). Moreover, plaintiff reported that her "migraines wipe me out" (Id.).

16. After resuming work on September 9, 1985 following her extended leave, plaintiff seldom arrived at the Hospital before 10:00 A.M. and frequently much later. Plaintiff's punctuality and attendance were erratic, and plaintiff made unapproved changes in working hours to accommodate her morning problem. Plaintiff was repeatedly directed by her supervisors to arrive at work by 8:00 A.M., but plaintiff persistently failed to do so. Plaintiff's continued tardy arrivals were a source of constant friction with her supervisors.

17. On or about September 19, 1985, approximately two weeks after her return to work following the extended leave, plaintiff, herself recognizing that she could not indefinitely continue her erratic attendance and arrival times, requested that her tour of duty as Head Nurse be officially changed to allow her to work from 10:00 A.M. to 6:30 P.M. In support of that request, plaintiff submitted a letter from Dr. Barnes, dated September 19, 1985, stating that plaintiff was under her care for "extreme stress" and "needs to work a later shift daily. This could best be accomplished by her starting work after 10 A.M. daily" (pltf's exh. 2). This terse request for a change in plaintiff's regular work schedule, ostensibly for an indefinite period of time, made no mention whatever of plaintiff's depressive illness, treatment, medication regimen or prognosis and offered no explanation whatever regarding the significance of a 10:00 A.M. starting time.

18. A memorandum dated September 20, 1985 from Lily I. Lee, R.N., Assistant Chief of Nursing Service/Psychiatry, discloses that Lee met with plaintiff on September 19, 1985 and inquired, inter alia, concerning why plaintiff "was working such odd tours, as she was a Head Nurse and must work an administrative work week of 7:30 a.m. to 4:00 p.m. or 8:00 a.m. to 4:30 p.m., as posted." Lee made it clear to plaintiff that to effectively operate a unit, any other hours than an administrative tour of duty would be unacceptable for a Head Nurse (deft's exh. F).

19. Dr. Richard Donn, Chief of Staff of the Hospital and Clinical Associate Professor of Psychiatry, wrote to Dr. Barnes on September 23, 1985 seeking information concerning plaintiff's clinical history, onset and nature of symptoms, diagnosis, treatment plan, prognosis, etc. Plaintiff refused Dr. Barnes' request for consent to release of the medical information sought by Dr. Donn (deft's exh. H); accordingly, Dr. Barnes did not respond and furnish the requested medical information.

20. On September 24, 1985 Lee denied plaintiff's request for a change in tour of duty and directed plaintiff, in writing, to work an administrative tour of duty, 8:00 A.M. to 4:30 P.M., which could be changed only after discussion with her supervisor (joint exh. 1A). Further, plaintiff was informed by Lee: "Any deviation from this direct documented order shall result in a disciplinary action" (Id.).

21. Dissatisfied with the denial of her request, plaintiff immediately contacted an Equal Employment Opportunity (EEO) Counselor for informal resolution of her problem. Counseling did not result in an informal resolution.

22. On October 8, 1985, prior to any formal complaint of discrimination to the Equal Employment Opportunity Commission (EEOC), plaintiff submitted an application with the Hospital for disability retirement. Plaintiff was not coerced by defendant to seek a disability retirement. Indeed, after plaintiff's application was filed, the Hospital delayed processing the application until January 1986, continued to request medical information from Dr. Barnes and explore accommodation and, as discussed infra, even offered plaintiff a reassignment to accommodate her requested tour of duty so plaintiff could continue working.

23. On October 22, 1985, and during the pendency of her application for a disability retirement, plaintiff filed a complaint with the EEOC alleging that the Hospital had denied her request for accommodation and engaged in discriminatory treatment against her because she was black and handicapped.

24. On November 18, 1985 and November 21, 1985 plaintiff received memoranda from Lee (deft's exhs. B and I) complaining about plaintiff's persistent failure to work her scheduled administrative tour of duty—8:00 A.M. to 4:30 P.M., plaintiff's showing up for work "at whatever time [she] desired" (deft's exh. I) ("She usually comes in 10:00 a.m. or 11:00 a.m., sometimes later. * * * I then placed her at reporting in at 1:00 p.m." (deft's exh. B)), plaintiff's failure to "report in" her arrival time at work, and failure to notify her supervisor that she would not be on duty as scheduled (deft's exh. I). Plaintiff was also accused of fraudulently falsifying her arrival time on future time sheets. *Id.*

25. In order for supervisors to verify the time of arrival of Head Nurses, plaintiff and all other Head Nurses were directed to call the Nursing Office to report their time of arrival each day. Unknown to plaintiff, Head Nurses who complained about the "report in" procedure were permitted to ignore it, but plaintiff was held strictly to such requirement (pltf's exh. 6; deft's exhs. B and I). 20.

26. On December 8, 1985, and during the pendency of her retirement application, plaintiff made a second request for a 10:00 A.M. starting time, which request was denied.

27. On January 2, 1986, prior to any investigation of plaintiff's complaint by the EEOC or the expiration of the 180 day waiting period for commencing a lawsuit prescribed under 42 U.S.C. § 2000e–16(c), she filed this action *pro se* charging illegal race and handicap discrimination. As noted *infra,* the EEOC conducted an investigation of plaintiff's discrimination complaint—October 20–24, 1986—while this action was pending and after plaintiff had already retired on a disability pension. As further noted *infra,* after plaintiff had applied for disability retirement and commenced a law suit charging discrimination, the Office of General Counsel of the Veterans Administration reviewed the investigative record and published a final decision adverse to plaintiff's EEO complaint on October 30, 1987.

28. By letter dated January 8, 1986 Dr. Barnes again requested that plaintiff's tour of duty commence at 10 A.M. for at least two months "to accommodate for her job-related handicap" (pltf's exh. 3). Dr. Barnes now disclosed, but without explanation, that the requested accommodation of a 10:00 A.M. starting time was needed because of plaintiff's "medication schedule." *Id.* However, Dr. Barnes did not reveal her diagnosis of plaintiff's severe depression or her sedating antidepressant medication regimen. Finally, Dr. Barnes' proffered prognosis for plaintiff's recovery was vague (prefaced with "I would assume * * * "), conditional on an amelioration of plaintiff's stress on the job, the success of weekly psychotherapy sessions for an indefinite period of time and plaintiff's medication regimen. Significantly, no timeframe for plaintiff's recovery was suggested by Dr. Barnes. In short, Dr. Barnes' *medical justification* for the requested accommodation was largely unsubstantiated by her limited disclosures.

29. On January 10, 1986 Dr. Donn again wrote Dr. Barnes adverting to the latter's unsubstantiated request for a special tour of duty for plaintiff due to her "medication schedule." Dr. Donn inquired of Dr. Barnes into the medical justification for her request and stated:

We have many employees who take medications and I am unaware of any who have had to have special tours of duty as a consequence of that fact. *Nevertheless, I am prepared to keep an open mind, but need to know more,* specifically what medications Ms. Guice–Mills is taking, as well as the dosage and regimen prescribed. In addition, I would like to know specifically what your medical reasoning is in suggesting that an al-

tered tour is necessary *and what alternatives, if any, you've considered.*

Deft's exh. L (emphasis added).

30. There was no response by Dr. Barnes to Dr. Donn's inquiries. A memorandum by Dr. Donn dated January 14, 1986 reveals that in a telephone call on that date, Dr. Barnes disclosed to Dr. Donn only that plaintiff suffered from migraine headaches, stress and an inability to get started in the morning. When Dr. Barnes was questioned specifically by Dr. Donn concerning plaintiff's medication regimen, Dr. Barnes declined to furnish any information on the grounds of confidentiality. Pltf's exh. M. In his memorandum of January 14, 1986, Dr. Donn stated: "Based on the paucity of medical information and the subjectivity of the information provided by Dr. Barnes, I am unable at this point to justify the granting of a change in her tour of duty." *Id.* Importantly, there is no evidence whatever that at such point in time plaintiff's supervisors were aware that she was suffering from depression or that they regarded her as "mentally impaired" and discriminated against plaintiff in any manner on account of her impairment.

31. By memorandum of January 10, 1986 Rosell Knight, R.N., Chief, Nursing Service, for reasons of administrative inconvenience, rejected plaintiff's second request for change of work schedule from 10:00 A.M. to 6:30 P.M.:

2. "[A]ll Head Nurses must continue to work a primarily administrative tour of duty either 7:30 a.m. to 4:00 p.m. or 8:00 a.m.–4:30 p.m. The primary purpose of the Head Nurses' role is to function as Nursing Service's first line manager in the patient care unit; therefore, I want the Head Nurse to work when the majority of administrative activities occur at this Medical Center.

3. There are *occasions* when the Head Nurse must work different tours than what I cited above *but these incidences are limited to working to facilitate adequate staffing coverage on the patient care unit, to conduct administrative meetings, or to perform training activities with staff.*

4. Nursing Service sincerely regrets that reporting to work at 7:30 a.m. or 8:00 a.m. is a problem for you; however, in the assigned role of Head Nurse this reporting time is required. *I would be willing to reassign you to a staff nurse position if you desire which would facilitate your ability to work a 10:00 a.m.–6:30 p.m. tour of duty on a regular basis.*"

Joint Exh. 2B (emphasis added).

32. Hence, as a matter of established practice, no Head Nurses were permitted to deviate from the administrative work week *on a regular basis;* recognizing the necessity for occasional and brief deviations from an administrative work week for reasons of administrative convenience, Knight regarded the pre–10:00 A.M. period of the administrative tour of duty and responsibilities assigned to a Head Nurse fundamentally sacrosanct to proper nursing care management, not negotiable nor subject to modification.

33. Difficulties encountered by plaintiff's absence prior to 10:00 A.M.: staffing problems had to be handled by an assistant with other responsibilities; meetings held prior to 10:00 A.M. were missed; night supervisor's patient care activities could not be reviewed with plaintiff and treatment modifications discussed causing delays in such modifications or necessary follow-through; and handling of problems with other services that required the attention of a Head Nurse went unattended (deft's exh. P).

34. Although there was no written policy by the Hospital requiring Head Nurses to work administrative tours of duty, as a matter of established practice prior to plaintiff's request for a 10:00 A.M. starting hour, Head Nurses could choose among 8–½ hour administrative tours of duty commencing at 7:00, 7:30 or 8:00 A.M., whichever they preferred. Also, as needed, Head Nurses could work other approved tours of duty, to meet with staff on off tours or for other reasons. The latter occurred *only occasionally* (once or twice a month)—and *not on any extended basis* (pltf's exh. 6).

35. *There was no precedent whatever in the Hospital for a Head Nurse working a 10:00 A.M. to 6:30 P.M. tour of duty on an extended and indefinite basis, as requested by plaintiff.* Deviations from an administrative work week were occasionally permitted Head Nurses for administrative convenience, but *there is no evidence of any policy or practice by the Hospital—indeed not even an instance—of nonconformity to the administrative work week for an extended or indefinite period by Head Nurses.* There was no discriminatory treatment of plaintiff in regard to the Hospital's insistence on plaintiff's compliance with her assigned administrative tour of duty commencing at 8:00 A.M.

36. The Hospital's refusal to permit plaintiff to arrive at work regularly at 10:00 A.M. for an indefinite period (at least two months), insistence that she work an administrative work week starting at 7:30 or 8:00 A.M., and refusal to alter such tour of duty as an accommodation for plaintiff were not discriminatory, but based primarily on the nature of a Head Nurse's responsibilities and duties, administrative efficiency and a Hospital policy applicable to all its Head Nurses. The requirement of plaintiff's supervisors that she work an administrative work week was reasonable and within supervisory authority and discretion. Occasional exceptions for other Head Nurses from the administrative work week for brief periods based on administrative convenience do not establish discrimination against plaintiff, who requested a 10:00 A.M. to 6:30 P.M. tour of duty on a *regular, extended and indefinite basis* for purely personal problems (that were not even fully disclosed to the Hospital).

37. Notwithstanding the lack of adequate medical disclosures by Dr. Barnes establishing an asserted stress based "handicap" and need for accommodation (Dr. Barnes never disclosed to Dr. Donn that plaintiff was suffering from severe depression), Knight explicitly offered to reassign plaintiff to a staff nurse position to accommodate plaintiff's requested tour of duty. Since such staff nurse position fell within plaintiff's professional experi-ence and qualifications *and would have permitted plaintiff on a regular and indefinite basis to work the requested 10:00 A.M. to 6:30 P.M. tour of duty*, the offered accommodation was eminently reasonable.

38. Plaintiff rejected Knight's offer of a staff nursing position. It was plaintiff's position on the one hand that the staff nurse position would have been a demotion from Head Nurse, but on the other hand that she was not competent to perform the duties of a staff nurse. Plaintiff's further contention that she was offered a "lower ranked" staff position notwithstanding the availability of equivalent alternative nursing positions is without evidentiary support. Plaintiff makes no assertion that the proposed reassignment would have resulted in the reduction of her grade and/or salary.

39. Plaintiff's October 8, 1985 application for a disability retirement was approved in April 1986, prior to the investigation of her EEOC complaint in October 1986. She terminated her employment at the Hospital on disability retirement on April 25, 1986.

40. After plaintiff retired from the Hospital on a total disability pension in the sum of approximately $20,000 a year, plaintiff applied for nursing positions at Cornell Medical Center, Columbia University, and a number of others. These hospitals would not employ her.

41. The EEOC made no final determination of plaintiff's complaint. Subsequent to receiving the notice of proposed disposition by the EEOC, plaintiff requested a final agency decision by the Veteran's Administration, Office of General Counsel based on the investigative record. Thereafter, the file was returned to the Agency for a final Agency decision based on the evidence of record (deft. exh. P). On October 30, 1987, the agency's General Counsel determined that plaintiff had not been discriminated against on the basis of race or handicap, and in any event her voluntary retirement on disability "makes any appropriate remedy moot" (*Id.*).

42. On March 13, 1990 the U.S. Department of Labor Administration, pursuant to a review under 5 U.S.C. § 8128, approved plaintiff's claim under the Federal Employees' Compensation Act, 5 U.S.C. § 8101 *et seq.* for worker's compensation predicated on employment related "Post Traumatic Stress Disorder." Pltf's exh. 7.

43. Plaintiff argues that she was forced to give up her position as Head Nurse and retire on a disability pension by defendant's unreasonable and discriminatory denial of plaintiff's requested accommodation, by otherwise making it difficult for plaintiff to perform her duties and by other discriminatory conduct—hence, asserts plaintiff, she was "constructively discharged."

44. As determined *supra,* plaintiff's requested accommodation was denied because it was unreasonable for administrative reasons; but despite inadequate substantiation of handicap by Dr. Barnes at that point in time, defendant still offered plaintiff an alternative accommodation. Moreover, there is no credible evidence that plaintiff's supervisors retaliated for her filing a discrimination complaint, deliberately made plaintiff's working conditions intolerable, harassed her, or denied her requested accommodation so plaintiff would leave the Hospital. Those scenarios are totally inconsistent with the Hospital's delayed processing of plaintiff's retirement application, plaintiff's consistently satisfactory ratings on her proficiency reports (pltf's exh. 5), and Knight's offer of a staff nursing position, if plaintiff desired—so that she could work a 10:00 A.M. to 6:30 P.M. or other flexible tour of duty on a regular basis (joint exh. 2B). Finally, to the extent that the evidence shows plaintiff's supervisors selectively enforced against her the generally applicable procedures concerning leave approval, modifications in tour of duty, reporting in on arrival in the morning, etc., such selective enforcement was due to her recalcitrant noncompliance with the procedures and not due to her mental impairment.

45. In sum, after a *de novo* review, the court finds there is no credible evidence that any of plaintiff's supervisors singled her out for disparate or discriminatory treatment or denied her requested accommodation on account of her stress or depression.

### Conclusions of Law

1. Plaintiff is entitled to *de novo* judicial review concerning her complaint of discrimination. *See Daniels v. Barry,* 659 F.Supp. 999 (D.D.C.1987). Plaintiff has not pursued her initial claim of discrimination on the basis of race (black); thus, handicap (mental impairment) discrimination is the sole claim before the court.

2. The Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701 *et seq.,* prohibits federal agencies from discriminating against qualified handicapped persons. The protection accorded by the Act may be enforced by a private cause of action. *Hall v. U.S. Postal Service,* 857 F.2d 1073 (6th Cir.1988); *Prewitt v. United States Postal Service,* 662 F.2d 292 (5th Cir.1981). *See also* 29 C.F.R. § 1613.703.

3. Plaintiff had the burden of establishing that she was "handicapped." Under 29 U.S.C. § 706(7)(B), a "handicapped individual" is defined as: "[A]ny person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment." A "mental impairment" includes "any mental or psychological disorder such as ... emotional or mental illness." 29 C.F.R. § 1613.-702(a)(1986); 29 C.F.R. § 1613.702(c) (1986); 41 C.F.R. § 60.741, Appendix A (1987).

4. "Impairment" includes "any condition which weakens, diminishes, restricts or otherwise damages an individual's health or physical or mental activity." *Perez v. Philadelphia Housing Auth.,* 677 F.Supp. 357, 361 (E.D.Pa.1987). Various forms and degrees of mental and emotional impairments have been determined to fall within the statute. *See Doe v. Region 13 Mental Health–Mental Retardation Commission,* 704 F.2d 1402 (5th Cir.1983); *Doe v. New York University,* 666 F.2d 761 (2d Cir.1981). A major depressive episode as

**198**

described in the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders III–R constitutes "mental impairment" within the purview of 29 U.S.C. § 706(7)(B) and the regulations.

5. In 1985–86, and at various other periods, plaintiff had severe depression and other emotional disorders, and hence a "mental impairment" within the purview of the statute.

6. For "mental impairment" to constitute a "handicap," such impairment must "substantially limit" one or more of an individual's "life activities." Working, employment and pursuing one's professional responsibilities are "major life activities" within the ambit of the statute and regulations, 29 C.F.R. § 1613.702(c).

7. Plaintiff's "mental impairment" disabled her from performing her professional duties as a Head Nurse during two months of sick leave in July and August 1984, during a seven months leave of absence in 1985, and thereafter in 1985–86 (until plaintiff's disabililty retirement), prior to 10:00 A.M. Accordingly, plaintiff's mental impairment "substantially limited" a major life activity within the meaning of section 706(7)(B): working, employment and pursuing professional activities as Head Nurse.

8. An impairment falls within the statute even though it interferes with ability to work only during certain hours. *Rhone v. United States Department of the Army,* 665 F.Supp. 734, 742 (E.D.Mo.1987) (evening or night shifts).

9. Plaintiff's severe depressive disorder qualified her as a "handicapped individual" as defined in the statute and regulations thereunder.

10. Alcoholics may be "handicapped" and protected by the statute. *See Whitlock v. Donovan,* 598 F.Supp. 126 (D.D.C.1984), *aff'd sub nom. Whitlock v. Brock,* 790 F.2d 964 (D.C.Cir.1986); *Crewe v. United States Office of Personnel Management,* 834 F.2d 140 (8th Cir.1987). *A fortiori,* a "mental impairment" based handicap under 29 U.S.C. § 706(7)(B) is not precluded by a psychiatrist's (and patient's) decision to treat depression with a sedating

antidepressant medication although nonsedating antidepressant medications are also available. However, a sedating medication regimen for the treatment of depression is relevant to the issue, discussed *infra,* of whether plaintiff was "otherwise qualified" for the position of Head Nurse.

11. Only those handicapped individuals who are "otherwise qualified" for employment are protected by the statute. *Joyner By Lowry v. Dumpson,* 712 F.2d 770 (2d Cir.1983); *Doe v. New York University,* 666 F.2d 761 (2d Cir.1981); 29 C.F.R. § 1613.702(a)–(f).

12. The implementing regulations define a "qualified handicapped person" as one who *"with* or without *reasonable accommodation,* can perform the *essential functions* of the position in question without endangering the health and safety of the individual or others."* 29 C.F.R. § 1613.702(f) (1986). *School Board of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987); 45 C.F.R. § 84.3(k).

13. Under section 501(b) of the Act and 29 C.F.R. § 1613.704, a Federal employer has a duty to accommodate the needs of qualified handicapped employees unless the accommodation would impose undue hardship on the operation of its program. *Prewitt,* 662 F.2d at 308; *Rhone,* 665 F.Supp. at 743; 29 C.F.R. § 1613.704. An accommodation is "reasonable" when "any employment barrier is surmountable without substantial modification in the requirements of the position or undue administrative or financial burden." *Trimble v. Carlin,* 633 F.Supp. 367, 371 (E.D.Pa.1986); *Mackay v. United States Postal Service,* 607 F.Supp. 271, 279 (E.D.Pa.1985).

14. "Reasonable accommodation" may include job restructuring, and parttime or modified work schedules. 29 C.F.R. § 1613.704(b)(2) (1986). *See Treadwell v. Alexander,* 707 F.2d 473 (11th Cir. 1983). Plaintiff contends that with a "reasonable accommodation," *viz.,* commencing work at 10:00 A.M., she could have performed all of the essential functions of a Head Nurse at the Hospital; and that de-

fendant had a duty under the statute to so accommodate her. The court is unable to agree with plaintiff that the Hospital had a duty to grant her requested accommodation—10:00 starting hour.

15. The Hospital as a matter of administrative necessity, discretion and convenience had the right to prescribe the regular tours of duty for its nursing personnel, prescribe different tours of duty for different personnel, and make appropriate exceptions in employees' work schedules for administrative convenience. An employer must be given broad latitude in work scheduling and its administration, particularly regarding its professional, management and supervisory personnel.

16. The record abundantly establishes that an administrative work week tour of duty was a critical requirement for the position of Head Nurse at the Hospital. Therefore, the Hospital had the right to require all Head Nurses, including plaintiff, to work an "administrative work week" notwithstanding that the Hospital granted occassional and brief exceptions for administrative convenience.

17. A federal agency is not required to provide a handicapped employee a modified special work schedule on a regular basis for an extended or indefinite period of time that imposes an undue hardship or unreasonable administrative burden on the agency. *See* 29 C.F.R. § 1613.704(a); 45 C.F.R. § 84.3(k); *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987); *Southeastern Community College v. Davis*, 442 U.S. 397, 412, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979); *Simon v. St. Louis County*, 656 F.2d 316, 320 (8th Cir.1981), *cert. denied*, 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982); *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *Hurst v. United States Postal Service*, 653 F.Supp. 259, 261 (N.D.Ga.1986); *Trimble*, 633 F.Supp. at 371; *Mackay*, 607 F.Supp. at 279.

18. Plaintiff's requested accommodation, *i.e.*, tour of duty commencing at 10:00 A.M., if granted, would have imposed an "unreasonable" administrative burden on the Hospital; granting plaintiff such accommodation would have caused administrative difficulties due to her absence from work and required that defendant assign some of plaintiff's responsibilities as Head Nurse prior to 10:00 A.M. to a Head Nurse in an adjoining ward or on a lower ranked staff nurse on a *regular* basis for an *extended* (not less than two months) and *indefinite* period of time.

19. An "otherwise qualified" handicapped person is one who "is able to meet *all* of the program's requirements in spite of [her] handicap." *Southeastern Community College*, 442 U.S. at 406, 99 S.Ct. at 2367. *See also School Bd. of Nassau Cty.*, 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17. Head Nurses at the Hospital were required to ordinarily be on duty during the "administrative work week," commencing daily at 7:00, 7:30 or 8:00 A.M. Since plaintiff, because of her depression and sedating medication regimen, was admittedly unable to report to work prior to 10:00 A.M., she was not "otherwise qualified" for the *position of Head Nurse*. *Alderson v. Postmaster General of the United States*, 598 F.Supp. 49, 54 (W.D.Okla.1984).

20. Reasonable accommodation includes an appropriate reassignment and "federal employers are bound to undertake a reasonable and competent attempt to retain such employees in a capacity in which they are qualified and capable of serving." *Rhone*, 665 F.Supp. at 744 (defendants were obligated to make a "substantial effort to find handicapped employee a position in which he could satisfactorily perform").

21. The Hospital's proffered reassignment of plaintiff to staff nurse took into account plaintiff's qualifications *and capacity to serve* and would have been a "reasonable accommodation." Plaintiff had spent a substantial percentage of her nursing career as a staff nurse, and such position would have allowed plaintiff to continue working as a nurse without reduction of grade and pay level, but with flexible hours and the tour of duty she requested, without undue hardship to the Hospital.

22. Under 29 U.S.C. § 794a(a)(1), the rights, remedies and procedures set forth

in section 717 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16, are applicable to complaints of handicap discrimination brought by a federal employee against a federal agency. Hence, prior to bringing suit, federal employees must exhaust their administrative remedies. *De la Torres v. Bolger*, 781 F.2d 1134 (5th Cir.1986); *Gardner v. Morris*, 752 F.2d 1271 (8th Cir.1985); *Boyd v. United States Postal Serv.*, 752 F.2d 410 (9th Cir.1985); *Johnson v. Orr*, 747 F.2d 1352 (10th Cir.1984); *Smith v. United States Postal Serv.*, 742 F.2d 257 (6th Cir.1984). *See also Prewitt*, 662 F.2d at 311, 313; *Mackay, supra; Neves v. Kolaski*, 602 F.Supp. 645, 648–49 (D.R.I.1985); *Clark v. United States Postal Serv.*, 592 F.Supp. 631, 632 (D.Mass.1984); S.Rep. No. 890, 95th Cong., 2d Sess. 19 (1978).

23. Defendant, citing 42 U.S.C. § 2000e–16(c) (providing when a federal employee may commence a civil action in a federal court for discrimination), raises the issue of exhaustion of administrative remedies—limited solely to plaintiff's claim of constructive discharge. Defendant's contention that plaintiff's constructive discharge claim, raised for the first time in her amended and supplemental complaint, should be dismissed for lack of subject matter jurisdiction is predicated on the assertion that such claim is outside the scope of plaintiff's administrative charges and the ensuing investigation.

24. The court lacks subject matter jurisdiction over matters outside the scope of the investigation that could be reasonably expected to grow out of the administrative charge. *Lawson v. Burlington Industries*, 683 F.2d 862 (4th Cir.), *cert. denied*, 459 U.S. 944, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982); *Smith v. American President Lines, Ltd.*, 571 F.2d 102, 107 n. 10 (2d Cir.1978); *Grant v. Morgan Guaranty Trust Co. of New York*, 548 F.Supp. 1189, 1191 (S.D.N.Y.1982).

■ 25. Notwithstanding that plaintiff made no explicit administrative claim of "constructive discharge," the court has jurisdiction over such claim if "reasonably related" to the charge filed with the EEOC, including incidents occurring subsequent to the filing of the EEOC complaint. *Stewart v. United States I.N.S.*, 762 F.2d 193, 198 (2d Cir.1985); *Almendral v. New York State Office of Mental Health*, 743 F.2d 963, 967 (2d Cir.1984); *Goodman v. Heublein, Inc.*, 645 F.2d 127, 131 (2d Cir.1981); *Kirkland v. Buffalo Board of Education*, 622 F.2d 1066, 1068 (2d Cir.1980).

■ 26. Plaintiff's claim of "constructive discharge" arises out of, is related to, and is inextricably intertwined with the same alleged incidents of discriminatory misconduct and impropriety upon which plaintiff predicated her administrative claim. Hence, plaintiff's constructive discharge claim in her amended and supplemental complaint, although not explicitly asserted administratively, is properly before the court.

27. The Federal Tort Claims Act is not applicable to plaintiff's claim of constructive discharge.

■ 28. "A constructive discharge occurs when an employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987). When a constructive discharge is found, the employee's resignation is treated as if the employer had actually discharged the employee. *Id.*

■ 29. Plaintiff's constructive discharge claim is patently without merit: her requested accommodation was properly denied because granting such accommodation would have caused the Hospital an unreasonable administrative burden; she rejected a reasonable offer of reassignment to a staff nurse position, an alternative accommodation that would have met her 10:00 A.M. to 6:30 P.M. tour of duty requirement. And, as plaintiff had long been contemplating, even before requesting a change in her tour of duty (*see* deft's exh. C, last page), she voluntarily retired on a disability pension without even awaiting a final administrative determination of her EEOC complaint.

In sum, plaintiff has failed to establish that she was constructively discharged, subjected to any form of discrimination due to handicap, or was denied a reasonable accommodation for her mental impairment.

The complaint is dismissed without costs. The Clerk is directed to enter judgment accordingly.